STEWARD, Plaintiff in error, vs. THE STATE, Defendant in error.

*March 20—April 5, 1905.*

*Criminal law: Evidence: Rebuttal: Discretion: Insanity: Special issue: Form of verdict: Sanity at time of trial: Duty to make inquisition: Instructions: Court and jury.*

1. Where evidence offered as rebuttal is not strictly such, being upon a subject fully gone into in the evidence in chief, its admission or exclusion rests largely in the discretion of the trial court, and the judgment will be reversed only for abuse of such discretion.

2. Sec. 4697, Stats. 1898, does not prescribe the form of verdict upon the special issue of insanity, but only requires that the question of insanity or reasonable doubt of sanity shall be submitted in some form. Refusal to submit a form of verdict, requested by defendant, that there was reasonable doubt of his sanity at the time of the alleged offense and that he was not guilty for that reason, was not error, where the jury were properly instructed as to the burden of proof and as to reasonable doubt of sanity, and one of the forms submitted to them was in effect the same as that requested.

3. Under sec. 4700, Stats. 1898, it is the duty of the trial court, at any stage of the proceedings, upon proper application, if informed that there is a probability that defendant is then in-

sane, to make inquisition and determine that question before another step is taken in the trial, even though delay and embarrassment in the regular proceedings of the court should thereby result.

4. The verdict of the jury on the special issue, that defendant was sane at the time of the alleged offense, is not a determination of his sanity at the time of the trial.

5. Denial of inquisition as to defendant's sanity at the time of the trial upon the ground that the application therefor came too late is not a determination that he is sane at that time.

6. An instruction, in a criminal case, that the jury should not find defendant insane on the ground alone that he had been in the habit of telling exaggerated stories, or had manifested symptoms of melancholy, moroseness, mental exaltation or depression, or for any mere eccentricity or peculiarity, was an invasion of the province of the jury; and the error was not cured by the statement that such acts and symptoms might be taken into consideration in determining the question of insanity.

7. Evidence of acts and symptoms such as are above mentioned is *held* in this case sufficient to sustain a verdict of insanity. *Chafin Will Case*, 32 Wis. 557, distinguished.

ERROR to review a judgment of the circuit court for Chippewa county: A. J. VINJE,. Circuit Judge. *Reversed.*

On the 28th day of January, 1901, at the city of Stanley, Chippewa county, while the wife, two daughters, grandchild, and son-in-law of plaintiff in error were seated at dinner at the home of the son-in-law, Fred Miller, the plaintiff in error, then about sixty years of age, entered the rooms so occupied and shot and mortally wounded said Miller without any apparent motive therefor. Plaintiff in error was arrested, and the information charged him with the crime of murder in the first degree. A special plea of insanity was interposed. Upon such issue the jury rendered a verdict that at the time of commission of the alleged offense plaintiff in error was not insane. On the coming in of such verdict, counsel for plaintiff in error, upon information received from medical experts during the trial on the insanity issue, immediately informed the court that there was probability plaintiff in error was then insane and incapacitated to act

for himself, and asked for an inquisition, as provided by sec. 4700, Stats. 1898. Thereupon an order was entered denying the application upon the ground that it came too late. The trial then proceeded upon the information charging murder in the first degree, which resulted in a verdict of guilty. Motions in arrest of judgment and for new trial were made and denied, to all of which due exceptions were taken by plaintiff in error. Thereafter judgment of conviction was pronounced, and plaintiff in error sentenced to the Wisconsin state prison for the term of his natural life, from which judgment and conviction a writ of error was sued out and the record removed to this court.

The testimony produced on the trial tended to show that for a period of about thirteen years immediately subsequent to 1874 the plaintiff in error was employed at Badger, Wisconsin, in a mill, and while so engaged was struck upon the head by a bursting pulley and injured, of the effects of which he subsequently complained; that he went from Badger to Eau Claire, where he continued in the same line of employment, as a sawyer in a mill, until about seven or eight years prior to the homicide. While working in said mill he complained of his head aching, and was frequently laid off on that account, complained of trouble with his head, and ceased sawing in the mill on account of difficulty with his head. While working in the mill he had family troubles; would tell about them and cry. After ceasing work in mill at Eau Claire, he remained there about a year and a half without any particular employment; then went to New York; remained there about three years. While in New York he committed so many insane acts that a party wrote to the chief of police at Eau Claire relative to his conduct and requesting that he be taken care of. He returned to Eau Claire, found employment working in the woods in the winter seasons, and other seasons upon a small tract of land near Eau Claire. At times he would sit with his head down, ap-

parently in deep study, jump up suddenly, dance on the floor, sit down again, saying nothing unless spoken to, the expression of his countenance at such times being peculiar. Although the character of his wife was beyond reproach, he imagined she had run away with another man and was an inmate of a house of ill repute; imagined she was dead, and cried about it. People said he was crazy. The police officers considered him insane on Saturday preceding the homicide, which occurred on the following Monday. A cousin of his was committed to an insane asylum, and one of his brothers was considered insane. He was formerly lively, bright, and active. His condition was greatly changed during a period of eight or ten years preceding the homicide. He walked with his head down, passed people without noticing them; sometimes quiet, other times very talkative; his conversations incoherent and disconnected. While working, talked to himself. Sat around at times as though brooding over trouble, and had peculiar expression in his eyes. Would walk the streets in the nighttime, head down, talking to himself. About October, 1900, he went to Stanley, where he remained until a week before the homicide, during which time he worked in a laundry with deceased, lived with deceased, and spoke well of him. He and his wife, and deceased and his wife, lived in the same home. On Saturday preceding the homicide he requested an officer at Eau Claire to lock him up.

At 11 o'clock on day of the homicide, before taking the train at Eau Claire for Stanley, he had conversation with police officer, shook hands with him, bade him good-by, said he was going away, and probably officer would not see him again. After getting on the train he stated to an acquaintance that he was going to New York, appeared absent-minded, dazed, and had peculiar expression in his eyes. After arrival at Stanley, and a few minutes before homicide, he met an acquaintance, to whom he stated he would see him

later; appeared to be in a hurry and nervous. He went into the house of deceased, where family was seated at dinner, and said to deceased, "Fred, you have got to die. You have got to die," and shot him. His daughter, wife of deceased, said, "Now, pa, see what you have done," and he responded, "Never mind; I have something more." After the homicide, and when the officers came to the house of deceased to arrest him, he put his arms around his daughter's neck and said he wanted to kiss her, and kissed her. Immediately after the homicide he was cool, acting as though nothing had happened, made no effort to escape, and, when asked why he did the shooting, said, "I don't know; I loved the boy and loved the daughters." Immediately after the homicide, and after he was taken to the police station, an old acquaintance, whom he met and called by name a few minutes prior to the homicide, saw him, and he failed to recognize him. While at the station, and about three hours after the homicide, he appeared cool and collected, and remarked to several people who had gone to the station to see him that there must be some curiosity that people collected there, and said if the officer would take him out on the street he would exhibit himself; showed no remorse, did not seem to be excited in any way, and did not seem to realize that he had committed any crime.

The testimony further shows that he had exaggerated delusions of wealth, of being a detective, of being the owner of large properties, offering to pay bills of others in whom he had no interest, claiming he had large amounts of money on his person when he had none, placing exorbitant values on valueless papers, and putting them in a safe for safe-keeping, manifestations of undue and abnormal suspicions, suspicions that he was being robbed, visionary schemes, wanting to rent rooms for factory, delusion about having half a million dollars, offering to buy valuable properties. Medical experts testified to his insanity, based upon these delu-

sions and peculiarities which were testified to upon the trial. Several nonexperts who met him frequently, knew him well, and conversed with him pronounced him insane.

*W. H. Stafford,* for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General* and *Walter D. Corrigan* and *Frank T. Tucker,* assistant attorneys general, and oral argument by *Mr. Corrigan.*

Kerwin, J.    1. It is contended that the court erred in excluding the testimony of Dr. Ellenson.    After the plaintiff in error had proved his case on the special issue of insanity and the state had put in its testimony in reply and rested, the plaintiff in error called Dr. Ellenson and asked him whether the plaintiff in error was sane or insane.    This evidence was objected to on the ground that it was not rebuttal, and excluded, and the plaintiff in error claims this was prejudicial error.    It appears from an examination of the evidence that this subject had been fully gone into by the plaintiff in error in his evidence in chief.    Several witnesses were called on the question as to whether he was sane or insane for some time before and up to the time of the trial.    The evidence offered, therefore, was not strictly rebuttal (*Schissler v. State,* 122 Wis. 365, 99 N. W. 593), and the admission or exclusion of it rested largely in the discretion of the trial court, and, such discretion not having been abused, no reversible error was committed (*Schissler v. State, supra;* Jones, Evidence, §§ 809–811; *McDermott v. C. & N. W. R. Co.* 85 Wis. 102, 55 N. W. 179).

2. Error is assigned because the court refused to submit a form of verdict on the question of insanity to the effect that there was reasonable doubt of the sanity of plaintiff in error at the time of the commission of the alleged offense, and that he was not guilty of the offense charged against him for

that reason.    Counsel relies mainly upon the portion of sec. 4697, Stats. 1898, which reads as follows:

"And if such jury shall find upon such special issue that such accused person was so insane, or that there is a reasonable doubt of his sanity at the time of the commission of such alleged offense, they shall also find him not guilty of such offense for that reason."

Counsel cites no authority upon this point except the statute, which does not prescribe the form of verdict, the obvious meaning of it being that the question of insanity or reasonable doubt of sanity should be submitted to the jury in some form.    The jury was carefully instructed on the question of burden of proof and of reasonable doubt as to the sanity of accused at time of commission of the alleged offense.    Besides, it appears from the record that three forms of verdict were submitted to the jury, one on behalf of the state, and two by the plaintiff in error; one of those submitted by plaintiff in error presenting the issue in effect the same as requested, and being sufficient in form.    We therefore find no error in the submission of the question of insanity to the jury.

3.  Error is assigned because the court denied application for inquisition as to sanity of plaintiff in error at the time of trial.    This application was made immediately after trial on the special issue of insanity, and as soon as counsel for plaintiff in error had been informed that there was a probability that the accused was then insane and incapacitated to act for himself.    The application was denied by the court on the ground that it came too late.    Sec. 4700, Stats. 1898, provides:

"When any person is indicted or informed against for any offense if the court shall be informed, in any manner, that there is a probability that such accused person is, at the time of his trial, insane and thereby incapacitated to act for himself, the court shall, in a summary manner, make inquisition thereof by a jury or otherwise as it deems most proper. . . ."

This statute fixes no time for making such application, nor can it be gathered from it that the legislature intended it should be made at any particular time. In tracing the history of the law from early times, as well as the judicial construction given legislation upon this subject, it seems obvious that the legislature intended by the broad language used that the application might be made at any time during the progress of the trial without particular formality. In the absence of statute to the contrary, application for inquisition to determine whether accused is insane at time of trial can be made by counsel orally. 2 Bishop, New Crim. Proc. § 666; *Reg. v. Southey,* 4 Fost. & F. 864; *State v. Reed,* 41 La. Ann. 581, 7 South. 132. Blackstone in his Commentaries, book 4, p. 24, says:

"Also if a man in his sound memory commits a capital offense, and before arraignment for it he becomes mad, he ought not to be arraigned for it, because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried, for how can he make his defense? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of nonsane memory, execution shall be stayed; for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution."

The most distinguished writers on criminal jurisprudence concur in these humane views, and agree that no person in a state of insanity should ever be put upon his trial for an alleged crime, or tried or made to suffer the judgment of the law, while insane. 1 Hale, P. C. 34; 4 Bl. Comm. 395; 1 Chitty, Crim. Law (ed. 1847) 760, 761; 1 Russell, Crimes (ed. 1845) 14; 4 Harg. State Trials, 205; 2 Bishop, New Crim. Proc. § 666. Our statute is an affirmance of these humane principles of the common law, and the reason upon which it rests makes manifest the intention of the legisla-

ture.   It is therefore very clear that the legislature·in enacting this statute, broad and general as it is, intended to place a safeguard around the accused, so that at any time during the progress of the trial, when it appeared there was reasonable doubt as to his sanity, the court should grant inquisition and determine in some way that issue.   It was not necessary that the issue should be tried by a jury.   It was within the power of the legislature to prescribe the mode of trial, and, the statute having left it to the court, it was entirely proper that the court should hear and determine the issue without the intervention of a jury.   *Nobles v. Georgia,* 168 U. S. 398, 18 Sup. Ct. 87; *Crocker v. State,* 60 Wis. 553, 19 N. W. 435.   The authorities appear to be quite uniform that at any stage of the proceedings in a criminal case, when the matter of the present insanity of the accused is properly brought to the attention of the court, the question should be determined before another step is taken in the trial.   *State v: Arnold,* 12 Iowa, 479; *Nobles v. Georgia,* 168 U. S. 398, 18 Sup. Ct. 87; *Crocker v. State,* 60 Wis. 553, 19 N. W. 435; *People v. Ah Ying,* 42 Cal. 18; *State v. Reed,* 41 La. Ann. 581, 7 South. 132; *State v. Peacock,* 50 N. J. Law, 34, 11 Atl. 270; *Taffe v. State,* 23 Ark. 34; *People v. Farrell,* 31 Cal. 576; *Youtsey v. U. S.* 97 Fed. 937, 38 C. C. A. 562; *Frith's Case,* 22 How. St. Tr. 311.   We are therefore of the opinion that it was the duty of the court to grant inquisition and determine whether plaintiff in error was in a fit state to be tried.

It is claimed on the part of counsel for the state that the question of insanity at time of trial was, in effect, tried, because testimony was admitted concerning the sanity of plaintiff in error up to time of trial.   This contention cannot be sustained.   The application on the part of plaintiff in error for inquisition was made after the evidence was in on the special issue of insanity and as soon as counsel for the prisoner discovered that there was a probability accused was at

the time of trial insane.  Besides, it cannot be said that the issue of insanity at the time of trial was determined by the jury, because the verdict was confined specifically to insanity at the time of commission of the alleged offense.  It would be an unsafe rule to adopt that a finding of sanity at a time long anterior to trial should determine the sanity of the accused at the time of trial.

It is also claimed on behalf of counsel for the state that to give the statute a construction which would permit the trial of such an issue at any stage of the proceeding would greatly obstruct and embarrass the administration of the criminal law.  Since this matter could have been determined by the court without the intervention of a jury, and proceedings on the main issue suspended pending such investigation, it would not seem that there are strong grounds for such claim. And, even though it should occasion delay and some embarrassment in the regular and orderly proceedings of the court, yet we do not think this is a sufficient answer when the rights and liberties of a citizen are at stake.  Delay and embarrassment in the ordinary proceedings of a criminal trial are not sufficient ground to deprive a citizen accused of crime of his constitutional right to be heard in his own defense.  And if he be insane, he is incapacitated under all the authorities to be heard or to make a defense.  We are convinced, therefore, that under this statute the court was bound to determine in some manner the question of the insanity of the plaintiff in error when a proper application was made for such purpose. It appears from the record that the insanity was discovered during the trial, and a proper application made as soon as possible, and not denied because it was insufficient, but because the court ruled it came too late.

It is further contended on behalf of the state that the court did determine that plaintiff in error was sufficiently sane to be tried.  We do not think this position tenable.  It is true the court made such an intimation, but decided the applica-

tion for inquisition exclusively upon the ground that it came too late, placing the refusal solely upon that ground, and refrained from deciding the question of insanity at time of trial. We are therefore of the opinion that the plaintiff in error was entitled to have the question of his insanity at the time of trial determined, and that the denial of inquisition for that purpose was error.

4. Error is assigned because of the following instruction to the jury:

"You should not find the defendant insane on the ground alone that he had been in the habit of telling exaggerated stories, or that he has manifested symptoms of melancholy, moroseness, mental exaltation or depression, or for any mere mental eccentricity or peculiarity."

The question of insanity was for the jury. It was an inference to be deduced from the facts and circumstances disclosed by the evidence, and the facts and circumstances from which the jury must necessarily have determined whether or not the accused was insane consisted in a large degree of exaggerated stories, symptoms of melancholy, moroseness, mental exaltation or depression, mental eccentricity, or peculiarity. In fact, such characteristics were the controlling elements from which the jury should determine the sanity or insanity of the accused. Such characteristics might have been so pronounced as to warrant the jury in finding the accused insane. The court told the jury that they could not find the accused insane because of the existence of such characteristics, and, in effect, took from them the principal question in the case. Counsel for the state contends that this instruction was cured because the court stated in the same connection that such acts and symptoms might be taken into consideration in determining the insanity, but we do not think this cured the error. It was clearly the province of the jury to determine whether or not such characteristics, which in this case constituted the main evidence of insanity,

were sufficient to warrant them in finding the accused insane. Counsel for the state reviews at length the entire charge, for the purpose of showing that, taken as a whole, it fairly presented the question of insanity to the jury, but we are unable to see that the instruction complained of was not prejudicial to the accused. It told the jury plainly and unequivocally that the principal facts in evidence tending to show the insanity of the plaintiff in error were not sufficient for that purpose, and that they could not find him insane upon such evidence. Counsel also contends that such facts were not sufficient to warrant the jury in finding the accused insane under the decision of this court in *Chafin Will Case,* 32 Wis. 557. An examination of the *Chafin Will Case* will show that the testimony to prove insanity there was very different from the testimony in the case at bar. It was there held that belief in spiritual mediums, faith in the statements of professed clairvoyants, belief in witchcraft, and professions of a sinless life were not evidence of insanity. Other peculiarities proved were in reality no stronger evidence of insanity. Without pursuing the subject further, it may be said that the facts in the *Chafin Will Case* were very different from the facts in the case at bar.

After a careful examination of the record we are satisfied that the evidence was ample to sustain a verdict of insanity. We must hold that the court erred in denying inquisition as to sanity of plaintiff in error at the time of trial, and in the instruction complained of.

*By the Court.*—The judgment of the court below is reversed, and the cause remanded for a new trial. The warden of the state prison at Waupun is directed to deliver the plaintiff in error to the sheriff of Chippewa county, to be held in custody until discharged according to law.