Louls P. THURSBY, Jr.,

v.

STATE of Maine.

Supreme Judicial Court of Maine.

Sept. 27, 1966.

Farris & Foley, by Richard A. Foley, Augusta, for plaintiff.

John W. Benoit, Asst. Atty. Gen., Augusta, for defendant.

Before WEBBER, TAPLEY, MARDEN, and DUFRESNE, JJ.

DUFRESNE, Justice.

In January of 1957 Louis P. Thursby, Jr. was tried before the jury upon an indictment for murder to which he had pleaded not guilty and not guilty by reason of insanity. He was found guilty and sentenced to imprisonment for life at the Maine State Prison. He did not appeal and is presently serving his sentence. On September 18, 1963, Thursby filed in the Superior Court a petition for the issuance of the writ of coram nobis by which he sought to have the judgment of conviction vacated. His petition was dismissed upon motion and he appeals.

Technically, the question before us is the legal sufficiency of the petition. The petitioner seeks relief on the grounds that his trial, conviction and sentence were in violation of his constitutional rights under the federal and state constitutions (1) in that he was legally insane at the time of trial and could not properly prepare and participate in his own defense and (2) in that he was legally insane at the time of the commission of the offense. The Justice presiding at the coram nobis hearing ruled that petitioner's competency to stand trial, supported by the legal presumption of sanity and impliedly adjudicated by the Justice presiding at trial, could not be raised in a collateral proceeding such as coram nobis, and that the issue of insanity at the time of the offense, decided against the petitioner at trial, was a proper issue on appeal but not in post conviction remedies.

Petitioner did not support his alleged right to relief by any affidavit or offer of proof but relied exclusively in the hearing below upon the transcript of the evidence at the trial of the petitioner for murder at the January 1957 term of the Somerset County Superior Court, which was made available for consideration, and upon the admitted facts as alleged in his petition to the effect that "Dr. Harold A. Pooler, Superintendent of the Bangor State Hospital, testified that the petitioner was insane at the time he committed the act and that he didn't know right from wrong when he committed the act. The testimony of Dr. Harold A. Pooler was unrebutted by the State of Maine and no evidence that petitioner was sane at the time of the commission of the offense was presented by the State of Maine." And we may add in this connection that the record shows that Dr. Pooler further testified that "he [Thursby] was mentally ill at this time, or, is mentally ill at this time." In the light of the transcript of the evidence at the murder trial and the testimony admittedly given by the State psychiatrist, was the petitioner denied due process of law vitiating his conviction of murder? We answer in the negative.

Initially, let us note that the present petition for the writ of coram nobis was brought under the provisions of Public Laws of Maine, 1961, Chapter 131. Three days after the date of the petition, this statutory remedy of coram nobis was expressly repealed and replaced by our present post conviction habeas corpus proceedings provided by Public Laws of Maine, 1963, Chapter 310, now 14 M.R.S.A. § 5502 et seq. The present petition however qualifies within the statutory concept of an action pending at the time of the repeal so as not to be affected thereby. R.S.1954, c. 10, § 21, as amended by P.L.1961, c. 417, § 6, now 1 M.R.S.A. § 302.

From the transcript of the evidence at the murder trial, we find that Thursby at the time of his trial in January 1957, was 22 years of age. His father stated that young Thursby was afflicted from birth to the present time, with recurring spells of headaches which happened "every two

or three months maybe" and which caused him to go to bed for some two, three, four, eight or ten hours and to vomit and sweat. He would feel wobbly the next day. Pills had been prescribed for this condition. His schooling had taken him to the tenth grade. He was in the navy some two years or more. His mother confirmed these periodic headache spells during the two to three years next prior to the time of trial, as she had not had the child to bring up because of their marital separation. She testified that the petitioner had a mean head cold the day before the tragedy, which happened on September 25, 1956. Two officers testified that Thursby orally admitted that he had shot the deceased 5 times but disclosed no motive for the killing, except that prior to his leaving the house with his gun, he had the urge to kill something, a rabbit, squirrel or bird. Sheriff Henderson further stated that Thursby said that "as he brought the gun up and got Mr. Towle in his sights, he knew it was the wrong thing to do, but that he did it." From Dr. Harold A. Pooler, the Superintendent of the Bangor State Hospital at the time, called to the stand by the defense, we learn that the petitioner was committed to the hospital for observation on October 3, 1956. According to the doctor, young Thursby seemed rather dull, talked slowly but relevantly and coherently. He was rather vague and related that he did not know just what happened at the time of the accident, but remembered having a severe headache. He further stated that he had no reason to do what he had done and that he was very sorry, but that he did not seem to be himself and that it did not seem as though it was he that did it. The psychologist at the hospital, so Doctor Pooler testified, found that Thursby was a borderline intelligence case, and that he seemed rather dull and indifferent in the mental tests to the extent that the psychologist felt that he was not functioning on a normal level. Dr. Pooler referred to reports of behavior at work which he termed definitely abnormal, but the nature thereof was not disclosed. From these stated reports, the patient's recorded behavior in the hospital and from his personal observation, Dr. Pooler concluded that Louis P. Thursby, Jr., was insane at the time that he committed the act, and that he did not know right from wrong when he committed the act.

It is conceded that the petitioner had been committed to the Bangor State Hospital by order of the Superior Court for observation under R.S.1954, c. 27, § 118, in order that "the truth or falsity of the plea [of insanity] may be ascertained." We must assume that within the first 3 days of the January term of the Superior Court for Somerset County, the superintendent of the hospital reported to the Court that Thursby's detention at the hospital was no longer required for purposes of observation and the Court ordered his return for purposes of trial. The nature of the report made by the superintendent to the Court is not disclosed, but we may suppose that it contained the same conclusions expressed by Dr. Pooler in his testimony. It appears that Thursby was represented by an attorney of his choice at the murder trial. He asserted no claim in the coram nobis proceedings to the effect that he was inadequately or incompetently represented at trial. It is evident that counsel made full use of Dr. Pooler's testimony in support of Thursby's defense of insanity at the time of the offense, but no suggestion was made to the Court so far as the record shows, that Thursby was incompetent to stand trial. Such a claim was made for the first time in these post conviction proceedings.

■ In Dwyer v. State of Maine, 151 Me. 382, 120 A.2d 276, our Court recognized that the writ of error coram nobis was the proper common law vehicle to establish one's constitutional rights, upon a showing of an unjust deprivation thereof. The due process clause of our Maine Constitution, Article 1, Section 6, which guarantees a person against deprivation of life,

liberty, property or privileges, except by "judgment of his peers or the law of the land" secures to the individual the availability of the process and proceedings of the common law. Dwyer, supra, at page 392, 120 A.2d 276. Our coram nobis statute, P.L.1961, c. 131, R.S.1954, c. 126–A, in its remedial provisions against sentences imposed in violation of the Constitution of the United States or the Constitution of Maine, was merely declaratory of the common law.

The trial, conviction or sentencing of a person charged with a criminal offense, while he is legally incompetent violates his constitutional rights of due process. People v. Anderson, 31 Ill.2d 262, 201 N.E.2d 394 (1964); Brown v. People, 8 Ill.2d 540, 134 N.E.2d 760 (1956); Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (March 7, 1966); Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956).

Competence to stand trial sufficient to meet the requirements of due process means that the accused is capable of understanding the nature and object of the charges and proceedings against him, of comprehending his own condition in reference thereto, and of conducting in cooperation with his counsel his defense in a rational and reasonable manner. Glenn v. People, 9 Ill.2d 335, 137 N.E.2d 336 (1956); Withers v. People, 23 Ill.2d 131, 177 N.E.2d 203 (1961); Commonwealth v. Strickland, 375 S.W.2d 701, (Ky.1964).

"[S]anity for the purpose of present triability * * * is determined by appraising the present ability of the accused to so understand the nature and purpose of the proceedings taken against him as to be able to conduct his own defense in a rational manner." Magenton v. State, 76 S.D. 512, 81 N.W.2d 894 at 897, (1957).

Competence to stand trial as above understood is a necessary ingredient of procedural due process under Article 1, section 6, of the Constitution of Maine, which states that "[i]n all criminal prosecutions, the accused shall have a right to be heard *by himself* and his counsel, or either, at his election." [Emphasis supplied.] Mental incompetence at trial such as renders the accused incapable of comprehending the charge and the proceedings against him and of assisting counsel in his defense, if existing and not given effective remedial judicial recognition, would prevent such person from exercising his constitutional right to be heard by himself.

It is contradictory to argue that a defendant may be incompetent to stand trial and yet knowingly or intelligently waive his constitutional right of due process by waiving his right to have the court determine his capacity to stand trial. Counsel's failure to suggest to the court present mental incapacity at the time of trial and to request judicial determination thereof, is no bar in and of itself to relief in post conviction proceedings. See, Pate v. Robinson, 86 S.Ct. 836, supra; Taylor v. United States, 282 F.2d 16, 23 (C.A. 8th Cir. 1960). Mental competence to stand trial must be viewed as a basic and necessary foundation upon which a constitutional fair trial must depend. The mere thought of trying a person for crime when deprived of the mental capacity to make his defense or to understand his situation is shocking to our sense of fundamental fairness and such a judicial performance, if permitted, would be highly prejudicial and well calculated to result in injustice. When a sufficient claim of deprivation of such fundamental rights is made, it is in the interests of a well ordered society that there be a judicial determination of the issue when the same has not been adjudicated at the time of trial or prior thereto.

As stated in Carter v. State, 198 Miss. 523, 21 So.2d 404, (1945):

"One of the most fundamental and humane requirements of the common law, enshrined in the due process of law provision of our Constitution, is that no one shall be tried for the commission of a

crime when he is mentally incapable of making a rational defense, i. e., incapable of remembering and intelligently stating the facts on which his defense rests. This mental condition may be casual, temporary or permanent, and may result from any cause. When it is made to appear in the trial court that the mentality of a defendant in a criminal case is probably of this character, his trial should not be proceeded with until that question has been investigated, and it has been made to appear that he is sufficiently rational for the purposes of his defense. That this be done is not only a fundamental right of the defendant, but is also required by the State's public policy, as expressed in Sec. 14 of its Constitution, which prohibits the depriving of any person 'of life, liberty, or property except by due process of law.' "

A defendant's right in criminal proceedings to have his competence to stand trial judicially determined after a meaningful hearing is so intimately entwined with his constitutional right to a fair trial that in Pate, supra, the Supreme Court of the United States did conclude that a person accused of crime is constitutionally entitled to a hearing on that issue. As stated in Pate the Supreme Court of Illinois had held that the record in the trial court showed mental alertness and understanding in Robinson, the accused, in his "colloquies" with the trial judge and such finding was supported by the presumption of sanity, and that it was proper to deny a hearing on the issue of present competence to stand trial. The Supreme Court of the United States ruled that such denial was error because the evidence undisputably displayed a history of pronounced irrational behavior which no court could justifiably ignore. The long history of Robinson's disturbed behavior, referred to in Pate, supra, started at the early age of seven when he was struck by a brick dropped from a third floor with resulting impairment of the eyes and headaches. This was followed by incidents of hallucinations, violence and the hearing of voices. Furthermore Robinson had previously killed his son and attempted suicide by shooting himself in the head. He had severely beaten up his mother's brother-in-law. The final episode involved the killing of the woman with whom he lived. In contrast thereto, Thursby's history reveals headaches at intervals of 2 or 3 months, but no violence whatsoever. The only evidence of Thursby's mental deficiency came from the Superintendent of the State Hospital, Dr. Pooler. Pate v. Robinson, supra, is therefore not controlling.

Dr. Pooler's testimony at trial related to insanity in the general sense, in that Thursby did not know right from wrong when he committed the act, and when Dr. Pooler added that he also concluded that Thursby was mentally ill at this time, meaning at the very time he was testifying, he was referring to Thursby's present ignorance of right from wrong, and not to any incompetence to stand trial. This appears clearly from the record where the doctor admitted that Thursby had told "a coherent and credible story in regard to the happenings of September 25th" and that in his opinion Thursby "is mentally capable of making such a statement and knowing what he is doing."

■ The test to apply in order to determine the accused's competence to stand trial is not the McNaghten "right and wrong" rule. Magenton v. State, 76 S.D. 512, 81 N.W.2d 894, 897 (1957).

■ The testimony of experts as to insanity in a general sense is not sufficient to create a doubt as to competence to stand trial, if such expert testimony does not relate to the defendant's ability to conduct his defense. In re Dennis, 51 Cal.2d 666, 335 P.2d 657, at page 659.

■ A person may be insane according to many definitions of the word and still be capable of understanding the nature and object of the proceedings against him and

be able in co-operation with his counsel, to conduct his defense in a rational and reasonable manner. People v. Darling, 107 Cal.App.2d 635, 237 P.2d 691, at 695, (1951).

A person may be mentally competent to stand trial although upon other subjects his mind may be unsound. There are many prisoners who, although competent to stand trial, are mentally disturbed or defective and require psychiatric treatment. Withers v. People, 23 Ill.2d 131, 177 N.E.2d 203, 206 (1961). People v. Smyth, 3 N.Y.2d 184, 164 N.Y.S.2d 737, 143 N.E.2d 922 (1957). People v. Boundy, 10 N.Y.2d 518, 225 N.Y.S.2d 207, 180 N.E.2d 565.

Mental illnesses are of many sorts and have many characteristics. They may differ widely in their effects on a person's mental processes, his abilities and his behavior. To make a reasonable inference concerning the relationship between an alleged mental condition and the accused's competence to stand trial, the trier of the facts must be informed with some particularity. Labeling one's condition as that of insanity without any description of the particular actual manifestations of the alleged disease is insufficient pleading of mental incompetence to stand trial. Insanity in its popular sense signifies an unsoundness of mind, a derangement of the intellect; it may be complete or partial. It can vary from time to time. As such it does not necessarily connote incompetence to stand trial.

The trial court's knowledge that the accused was claiming that he was insane at the time the offense was committed and that such defense was to be affirmatively pleaded, as in the instant case, together with the concurring opinion of the state psychiatrist as reported to the court to the effect that Thursby was insane at the time of the offense, did not of themselves make necessary an inquiry into his present sanity, i. e. his competence to stand trial. Magenton v. State, supra; Weiland v. State, 58 Okl.Cr. 108, 50 P.2d 741.

A commitment simply for purposes of observation as provided under R.S.1954, c. 27. § 118, even though the resulting report be that the defendant was insane at the time of the commission of the act, is not a prior adjudication of insanity necessitating a preliminary finding of sanity before proceeding to trial. Cases such as Robinson v. Johnston, D.C.Cal., 50 F.Supp. 774, and Gunther v. United States, 94 U.S. App.D.C. 243, 215 F.2d 493, in which a previous adjudication of insanity existed, are not apposite. See, Dwyer v. Warden, Maryland House of Correction, 223 Md. 641, 162 A.2d 726 (1960).

We do recognize that an accused is entitled to a hearing or to an adequate opportunity to be heard thereon, on the question of his competence to stand trial and that such right is part of constitutional procedural due process. Brown v. People, 8 Ill.2d 540, 134 N.E.2d 760 (1956). Massey v. Moore, 348 U.S. 105, 75 S.Ct. 145, 99 L.Ed. 135.

But the initial responsibility of raising the question of incompetence of the accused to stand trial is on his counsel. When counsel becomes possessed of knowledge of a defendant's lack of mental capacity to comprehend his situation or to properly make his defense, it becomes his duty to promptly bring the matter to the attention of the court. People v. Maynard, 347 Ill. 422, 179 N.E. 833 (1932); State v. Smith, 173 Kan. 813, 252 P.2d 922 (1953); Magenton v. State, supra.

Furthermore, if the trial court learns from observation, reasonable claim or credible source that there is genuine doubt of defendant's mental condition to comprehend his situation or make his defense it is the duty of the court to order an inquiry concerning defendant's competence to stand trial, otherwise termed defendant's present sanity and determine that issue, and it may do so on its own initiative. The necessity for an inquiry under the particular circumstances addresses itself to the

sound discretion of the court and its decision will not be disturbed except for arbitrary action or abuse of judicial discretion. Dietz v. State, 149 Wis. 462, 136 N.W. 166, 173 (1912). State v. Smith, 173 Kan. 813, 252 P.2d 922, 923 (1953). Brown v. People, 8 Ill.2d 540, 134 N.E.2d 760, 762 (1956). Magenton v. State, 76 S.D. 512, 81 N.W. 2d 894, 897 (1957). People v. Smyth, 3 N.Y.2d 184, 164 N.Y.S.2d 737, 739, 143 N.E. 2d 922 (1957). Syphers v. Gladden, 230 Or. 148, 368 P.2d 942, 947, (1962).

The trial court in which the criminal case is pending has inherent jurisdiction to determine the issue of defendant's competence to stand trial. Syphers v. Gladden, supra; State v. Davis, 6 Wash.2d 696, 108 P.2d 641, 650 (1940); Cogburn v. State, 198 Tenn. 431, 281 S.W.2d 38 (1955). See also, Steward v. State, 124 Wis. 623, 102 N.W. 1079 (1905), where the common law procedure is discussed.

The method to be used by the trial court in determining the competence of the accused to stand trial, whether with or without the aid of a jury, and in the former, whether to impanel a special jury to determine the issue or to submit the issue to the trial jury, need not concern us in these proceedings and may better await the proper case when such specific issue is raised.

The record in the trial court clearly establishes that at no time did Thursby, his attorney, the State's counsel, the State's expert psychiatrist who testified for the defendant, nor anyone else, claim or suggest that Thursby was incompetent to stand trial. Dr. Pooler's testimonial assertion that Thursby was mentally ill at the time of trial had reference to the continued existence of his insane condition at the time of the commission of the acts which in Thursby consisted of depersonalization to the effect that when he riddled the victim's body with 5 separate bullet shots in quenching his thirst to kill something that day, bird or beast, "he did not seem to be

himself" and that "it did not seem as though it was he that did it." Dr. Pooler however admitted Thursby's mental capacity to testify, to tell a coherent and credible story and to know what he was doing. Let us add that Dr. Pooler's opinion of Thursby's legal insanity at the time of the alleged offense was rejected by the trial jury.

When counsel at no time suggests to the trial court the probability of the accused's incompetence to stand trial, a reviewing court is justified in assuming, unless the contrary appears, that counsel was satisfied that no such impairment existed. See Commonwealth ex rel. Smith v. Ashe, 364 Pa. 93, 71 A.2d 107, 114 (1950).

In the instant case, the trial court was alerted to Thursby's possible insanity at the time of the commission of the crime by the State Hospital report and by the affirmative plea of insanity. We may now assume from the presumption of regularity which attaches to final judgments of convictions, [see Bennett v. State, 161 Me. 489, 214 A.2d 667 (1965)] that if the trial court had entertained any doubt as to the petitioner's present sanity or competence to stand trial it would have used its inherent power to probe into his mental condition for purposes of triability. Syphers v. Gladden, 230 Or. 148, 368 P.2d 942 (1962).

The following cases are also in agreement with our holdings herein: Blodgett v. State, 245 S.W.2d 839 (Mo.1952); State v. Lucas, 30 N.J. 37, 73–74, 152 A.2d 50, 69–70 (1959); Bingham v. State, 82 Okl.Cr. 5, 165 P.2d 646 (1946). See also, Annotation in 142 A.L.R. page 961 et seq; 21 Am. Jur.2d §§ 62–73.

Petitioner's counsel however maintains that the State's motion to dismiss admitted Thursby's insanity at trial and his incompetence to prepare and participate in his defense. Reasoning from said premise counsel further claims that Thursby has sufficiently shown his entitlement to a hearing and that denial thereof was an unlawful

deprivation of constitutional due process. This contention is in error.

The instant petition for the writ of error coram nobis, without factual amplification, merely alleges that "the petitioner, Louis P. Thursby, was legally insane at the time of trial and could not properly prepare and participate in his own defense." We agree as indicated by Field and McKusick, in Maine Civil Practice, Comment § 12.11, that all well-pleaded material allegations are taken as admitted for the purposes of the motion, and that the defense of present insanity or incompetence to stand trial may properly be raised in the original criminal action by plea couched in the very language of the present petition in analogy to the plea of not guilty by reason of insanity. But 81(b) M.R.C.P. provides that "[t]hese rules do not alter the practice prescribed by the statutes of the State of Maine for beginning and conducting the following proceedings * * *: (1) Proceedings under the writs of coram nobis or coram vobis to review criminal actions" * * *. Our coram nobis statute, P.L.1961, chapter 131, § 4, under which the instant petition was brought, sets the following mandatory standards relating to the necessary contents of such petition, to wit: "[t]he petition shall identify the proceedings in which the petitioner was convicted, give the date of the entry of judgment and sentence complained of, *specifically alleging valid facts that set forth grounds upon which the petition is based. * * *"* [emphasis added.] Is the mere statement that Thursby was legally insane at the time of trial and could not properly prepare and participate in his own defense or that he was incompetent to stand trial or some such equivalent terminology, such "specifically alleging" of the facts validly setting forth grounds for relief contemplated by the statute?

We denote in the use of the expression "specifically alleging facts" a design on the part of the Legislature to lay emphasis on specificity. The omission of the word "specifically" might have given sanction to a general allegation such as contended for by the petitioner. "To allege specifically" equates in connotation the expression "to specify", which Webster's New International Dictionary defines: "To mention or name in a specific or explicit manner; to tell or state precisely or in detail." It contemplates a particularization of the facts as distinguished from a general statement thereof. See Brazil v. Dupree, 197 Or. 581, 250 P.2d 89, 91, 254 P.2d 1041; Herrin v. Erickson, 90 Mont. 259, 2 P.2d 296, 300; Queen City Valves, Inc. v. Peck, 161 Ohio St. 579, 120 N.E.2d 310, 313. To say that at the time of trial Thursby was insane or incompetent to stand trial or to prepare, participate or cooperate in his defense is to generalize. The facts to support this ultimate conclusion are the necessary specifics required by the statute to constitute a legally valid petition.

We may at this time suggest by way of example only, that specific facts to be alleged within the legislative intendment from which it may be concluded that the accused was incompetent to stand trial or incapable of preparing, participating or cooperating in his defense might be such as the fact of an official adjudication of insanity reasonably close in time to the event of the trial, whether prior thereto or thereafter; the fact that experts had reached an opinion, and so stated the same, specifically to the effect that the insanity with which the accused was afflicted, so affected his intelligence as to prevent him from comprehending his situation and helping his attorney in presenting and establishing his defense; the fact that his memory had been so impaired by his insane condition that he had no recollection of past events and could not significantly participate in his trial. We do not mean to intimate that any one or all of these illustrative factual situations are necessarily indispensable allegations to support a valid petition grounded on trial incompetence, nor do we wish to exclude any other fact that would spell incompetence to stand trial. We are only deciding

that the Legislature in its use of the expression "specifically alleging valid facts setting forth grounds upon which the petition is based" indicated that as a matter of public policy the writ of error coram nobis should not be available to set aside criminal convictions upon mere general assertions, but that the grievances upon which relief from sentence is sought must be detailed in depth. Any other holding permitting the use of the writ upon the mere naked assertion of the ultimate conclusion of insanity or incompetence to properly prepare, participate or cooperate in one's defense would guarantee to each inmate of our State Prison a trip to the Court House which would prove to be in all but an infinitesimal number of cases an exercise in frivolity.

The within petition fails to articulate sufficiently the specific grievances upon which reliance is made to secure the writ of error coram nobis. It was fatally deficient and summarily dismissable. See also, Johnson v. Williams, 244 Ala. 391, 13 So.2d 683, 686 (1943); Jenkins v. State, 223 Ark. 245, 265 S.W.2d 512, 514 (1954); People v. Smyth, 3 N.Y.2d 184, 164 N.Y.S.2d 737, 739, 143 N.E.2d 922 (1957); Bauerlien v. Warden, Maryland Penitentiary, 236 Md. 346, 203 A.2d 880 (1964).

We must conclude that the petitioner has failed in his attempt to raise in these post conviction proceedings the issue of his incompetence to stand trial.

The petitioner further seeks relief from his conviction on the ground of insanity at the time of the offense, and in support thereof, points to the testimony of Dr. Pooler which he says was uncontradicted. That issue was raised and adjudicated in the trial court. The writ of error coram nobis is not available to revise a decision made by the jury. Dwyer v. State, 151 Me. 382, 395, 120 A.2d 276. See also, Taylor v. United States, C.A. 8th Cir., 282 F.2d 16, 21 (1960).

Whether the writ of error coram nobis should issue on the petition is a question of law. Dwyer v. State, 151 Me. 383, 396, 120 A.2d 276.

No error appears and therefore the entry will be

Appeal denied.

WILLIAMSON, C. J., and RUDMAN, J., did not sit.