**STATE of Maine**

v.

**Kay PINKHAM–MURCH.**

Supreme Judicial Court of Maine.

Argued March 13, 1981.

Decided Aug. 7, 1981.

Janet Mills, Dist. Atty., Neria R. Douglass, Asst. Dist. Atty., Auburn (orally), for plaintiff.

Smith, Elliott, Wood & Nelson, P.A., Charles W. Smith, Sr. (orally), Karen B. Lovell, Saco, for defendant.

Before McKUSICK, C.J., and GODFREY, NICHOLS, GLASSMAN,* ROBERTS and CARTER, JJ.

McKUSICK, Chief Justice.

Defendant Kay Pinkham-Murch appeals from her conviction by a Superior Court (Androscoggin County) jury for aggravated forgery, 17–A M.R.S.A. § 702 (Supp.1980), asserting that the evidence was insufficient to warrant a guilty verdict beyond a reasonable doubt. We agree and accordingly reverse her conviction.

In July, 1975, defendant moved to Maine from Massachusetts, where, following her graduation from college, she had had over ten years' experience as consultant and manager in the telephone industry. In the fall of 1976, she met Maurice Rodrigue, a neighbor who for the past ten years had been employed as a school teacher. Rodrigue encouraged defendant's interest in starting her own telephone service business and, although he lacked any background in business affairs, indicated his own desire to become involved. Rodrigue introduced defendant to Frank Johanson. After spending the summer of 1977 making plans, the three on September 16, 1977, formed Northern Telecommunications, Inc. (NTI) for the purpose of selling and servicing telephone equipment and analyzing telephone systems. Defendant was elected president and Rodrigue, vice president and treasurer of the newly organized corporation.

The three business colleagues agreed that the corporation would issue 150 shares of capital stock without par value, and that each of them would contribute $5,000 and receive therefor 50 shares of stock. Rodrigue and Johanson immediately paid in $5,000 apiece; defendant paid in $2,200 in September, 1977, and around $633 more by the end of the following month. Initially, Rodrigue and Johanson each received 50 shares of stock and defendant received 22. The actual stock certificates were kept in the Lewiston office of NTI's clerk and counsel, William Hardy.

In mid-October, 1977, defendant and Rodrigue executed an agreement providing that they would vote their stock together, that they would submit any voting disputes to arbitration, and that neither would transfer any interest in the stock to anyone but the other. The stock certificates bore a notation of that agreement.

Although business prospects for the fledgling corporation at first seemed promising, problems soon arose. Johanson, who was also an employee of the corporation, was fired in March, 1978. NTI's deficit mounted, and the company found itself in need of additional capital. Friction began to develop between defendant and Rodrigue. Beginning in February of 1979, the two had numerous discussions centering around defendant's dissatisfaction with Rodrigue's handling of NTI's finances. The disagreements came to a head during the following summer.

---

* Glassman, J., sat at oral argument and participated in the initial conference, but died before this opinion was adopted.

First, in June, defendant herself took over from Rodrigue the financial operations of NTI. Then, in late August, defendant told Rodrigue she wanted her husband to assume control of NTI's finances, and threatened to resign if her demand was not satisfied. Rodrigue never responded specifically to defendant's request, but in mid-September he offered to sell her his stock and to resign as an officer of the corporation. Despite the facts that at that time NTI's liabilities exceeded its assets by some $100,000 and Rodrigue had paid only $5,000 for his 50 shares of stock, he refused to sell his stock to defendant for less than $52,000. Defendant rejected that offer.

Instead, defendant herself resigned her office as president of NTI on October 9, 1979, on the ground she could no longer work with Rodrigue. She did not also resign from NTI's board of directors, however; nor did she divest herself of her stock by selling it to Rodrigue in accordance with their voting agreement. At a couple of subsequent meetings of NTI's board of directors, each sought unsuccessfully to remove the other from the board.

Finally, on January 14, 1980, defendant was indicted on a single count of aggravated forgery, 17–A M.R.S.A. § 702.[1] The subject of the indictment was a certificate for 28 shares of NTI stock dated December 27, 1978, issued to defendant, and ostensibly signed by both defendant and Rodrigue as president and treasurer, respectively, of NTI. Those 28 shares represented the balance of the 50 that defendant, as one of NTI's three stockholders, had a right to purchase. Rodrigue's signature on the certificate was plainly a facsimile.

The State asserted that defendant had herself affixed Rodrigue's signature to the certificate by means of a rubber stamp kept in NTI's office primarily for the purpose of signing checks, and that she had done so intending to defraud or deceive Rodrigue, Johanson, or NTI by holding herself out as the owner of the 28 shares of stock, which the State asserted she was not entitled to do. On appeal, defendant contends that the evidence presented to the jury did not establish either that she had affixed Rodrigue's name to the certificate or that she had intended to defraud or deceive any person or entity named in the indictment.[2]

Viewed in the light most favorable to the State, *State v. Flick*, Me., 425 A.2d 167, 169 (1981), the record contained evidence sufficient to support a jury finding beyond a reasonable doubt that defendant stamped Rodrigue's facsimile signature on the certificate reflecting her ownership of 28 shares of NTI stock. From the testimony of Rolande LaPointe, a secretary for NTI, the jury could have found that one day sometime after May, 1978, defendant came walking through LaPointe's office in a hurry, asked her for Rodrigue's signature stamp, which was normally kept in LaPointe's desk, and used it once on a single eight-and-a-half by eleven inch piece of paper, mentioning that she was in a hurry to get back to attorney Hardy's office.

Defendant herself testified that Hardy had called her sometime during March of 1979 to tell her that 28 shares of her stock had not been "executed" and that she should obtain the proper signatures, and she further testified that she had taken the certificate in a brown envelope from Hardy's Lewiston office to NTI's office in Lisbon and given it to LaPointe to obtain Rodrigue's signature. Though he testified at trial, Hardy was never asked to give his

---

1. 17–A M.R.S.A. § 702(1) (Supp.1980) provides in pertinent part that:

   A person is guilty of aggravated forgery if, with intent to defraud or deceive another person or government, he falsely makes, completes, endorses or alters a written instrument . . ., and the instrument is:

   . . . .

   B. Part of an issue of stocks, bonds or other instruments representing interests in or claims against an organization or its property.

2. Defendant also contends that the presiding justice erroneously charged the jury on the finding required to prove that she intended to commit the crime of aggravated forgery. Because we decide favorably to her the issue on the sufficiency of the evidence, we need not reach the question of the propriety of the jury instructions.

version of those events. Defendant denied affixing the stamp herself and stated that she did not know how the certificate had gotten back into Hardy's office but that the attorney had told her in September, 1979, that the certificate was in his file, that Rodrigue's signature thereon was a facsimile, and that he would prefer to have an original signature on the certificate. Nothing in Hardy's testimony contradicted defendant's version of that September conversation. Defendant further testified that she had once again picked up the certificate at Hardy's office and brought it back to NTI's office, intending to have Rodrigue sign over the facsimile, but that she had resigned as NTI's president before that could be done. She stated that she had returned the certificate to Hardy's office shortly after her resignation.

▉ The testimony is thus in conflict on the issue of whether defendant actually affixed Rodrigue's signature to the certificate representing 28 shares of NTI stock. The jury, however, was entitled to resolve that conflict by assessing the credibility of the witnesses. *See State v. Barrett*, Me., 408 A.2d 1273, 1276 (1979). In the instant case, they could have believed LaPointe's version rather than defendant's and could have inferred from all the testimony that the piece of paper on which defendant stamped Rodrigue's signature was the stock certificate in question. Thus, the first jury determination is adequately supported by the evidence.

We conclude otherwise, however, as to the jury's other finding that defendant affixed Rodrigue's name to the stock certificate "with intent to defraud or deceive another person," 17–A M.R.S.A. 702(1). That statute makes intent to defraud or deceive an essential element of the offense of forgery. Of course, there will almost never be direct evidence of an accused's state of mind at the time of the commission of any criminal act. *Cf. State v. McEachern*, Me., 431 A.2d 39, 42 (1981) (homicide). For that reason,

> proof of the accused's intent at the time of the commission of the alleged criminal

act may be drawn from the act itself or from the existing circumstances surrounding the incident, as well as from any other evidence having a legitimate tendency to shed light upon the accused's intent or mental state at the time.

*State v. Anderson*, Me., 409 A.2d 1290, 1296 (1979). Whether the prosecution's proof comes in as circumstantial evidence or direct testimony or some of each, its sufficiency to convict depends upon whether the whole evidence establishes guilt beyond a reasonable doubt. As we recently stated in *State v. LeClair*, Me., 425 A.2d 182, 184 (1981):

> There is one single standard of proof for all criminal convictions, and the test is the same in a case of either circumstantial or direct evidence:
>
> > whether from all the evidence and from such reasonable inferences as may properly be drawn therefrom the guilt of a defendant has been proved beyond a reasonable doubt.

*State v. Jackson*, Me., 331 A.2d 361, 365 (1975). We went on in *LeClair* to describe the analysis that the jury must give the whole evidence:

> When the state produces circumstantial evidence tending to support an inference of the defendant's guilt, the jury must also consider, of course, any explanation for the evidence consistent with the defendant's innocence. The jury's guilty verdict must be based not on a determination that there exists no alternative explanation, but that, after assessing the credibility of such explanations, they raise no reasonable doubts as to the defendant's guilt.

*Id.* When after the jury has brought in a guilty verdict the defendant on appeal contends the evidence was insufficient to support that verdict, the Law Court must reverse if, viewing the evidence most favorably to the State, "no trier of fact rationally could find proof of guilt beyond a reasonable doubt." *State v. Flick, supra* at 169.

▉ Careful reading of this record compels us to conclude that the jury could not rationally ignore the existence of a reasona-

ble doubt whether defendant had the requisite criminal intent to defraud when she affixed Rodrigue's facsimile signature to the 28-share stock certificate. There can be no forgery if the instrument that has allegedly been falsely made or signed is incapable of defrauding. *See People v. Reichert*, 357 Ill. 205, 208, 191 N.E. 220, 221 (1934) (no intent to defraud when change of note to be a corporate obligation alone is not shown by evidence to depart from parties' contractual intent). The record reveals several factors giving rise as a matter of law to a reasonable doubt whether the 28-share stock certificate was capable of defrauding anyone.

The three business associates who formed NTI agreed prior to the corporation's inception that each would receive 50 shares and each would pay $5,000 to the corporation therefor. While the jury could have found that defendant never paid $5,000 in full, at no time did she ever deny her continuing obligation to the corporation to pay whatever balance she owed for her 50 shares. The accountant who assisted in incorporating NTI testified that he set up the corporation's books, prior to the onset of controversy between defendant and Rodrigue, to show full issuance of the 150 shares that NTI was authorized to issue and to carry as a corporate asset defendant's outstanding debt to the corporation for the unpaid balance of the $5,000 purchase price of her stock. Both he and defendant also stated that he had advised her that she was entitled to the shares from the moment the corporation commenced operations, regardless of actual payment. Moreover, defendant was of course aware of the restrictions on voting and sale to which her stock was subject. The Shareholders Agreement dated October 12, 1977, imposing those restrictions was plainly noted on the face of the stock certificate. Defendant never disavowed her duty to pay the corporation the full purchase price for the shares; and because of her agreement with Rodrigue noted on the stock certificate she had no right to transfer the stock or to vote it except in unison with his. The record, in short, establishes a reasonable doubt as to whether defendant could have intended her actions to defraud anyone.

By not producing evidence to establish beyond a reasonable doubt that defendant acted with the intent to defraud or deceive any other person or entity when she stamped Rodrigue's facsimile signature on the 28-share stock certificate, the prosecution failed to bear its burden of proving defendant's guilt of the crime of aggravated forgery. As a matter of law, the evidence presented to the jury was insufficient to support their verdict.

The entry must be:

Appeal sustained.

Judgment of the Superior Court reversed.

Remanded to the Superior Court for entry of a judgment of acquittal.

All concurring.