**STATE of Maine**

v.

**Harold LEDGER.**

Supreme Judicial Court of Maine.

Argued Nov. 16, 1981.

Decided April 26, 1982.

Charles K. Leadbetter, Fernand LaRochelle, Anita St. Onge, Frederick C. Moore (orally), Wayne S. Moss, Asst. Attys. Gen., Augusta, for plaintiff.

Paine & Lynch, Martha J. Harris (orally), Bangor, for defendant.

Before McKUSICK, C. J., and NICHOLS, ROBERTS, CARTER and VIOLETTE, JJ.

CARTER, Justice.

The defendant, Harold Ledger, has appealed from a judgment of conviction entered in the Superior Court, Somerset County, on a jury verdict finding him guilty of the murder of his wife, Carrie Ledger, in violation of 17–A M.R.S.A. § 201(1)(A).[1] We deny the appeal and affirm the judgment of conviction.

The jury would have been warranted in finding the following facts. The defendant resided in Smithfield with the victim, his wife, Carrie Ledger, until February 10, 1980. Shortly after he left the Smithfield home, the victim initiated a divorce action. The defendant thereafter manifested substantial antagonism toward the victim over a period of three months. He and the victim argued frequently when he returned to Smithfield on nearly a daily basis to feed his dogs. In late April, the defendant told a Somerset County sheriff that "someone" would be killed if the divorce action were pursued. On at least one occasion, he directly asked his wife to drop the suit; when she refused, he became visibly upset. The defendant's anguish over the matter was prompted by his concern for the ownership and integrity of the personal property he left in Smithfield. Indeed, he voiced this concern to a deputy sheriff and even asked that his wife be arrested in order to prevent her from tampering with his property.

The defendant stored several guns, including two handguns, at his mother's house in Norridgewock. Several weeks before the homicide, he retrieved one of the handguns.

The defendant's uncle, Albert Ledger, who was employed in Portsmouth, New Hampshire, at the time of Carrie Ledger's death, maintained a home in Skowhegan, but lived during the week in Kittery. On Sunday, May 11, 1980, the defendant agreed to drive Albert Ledger to Kittery, and Carrie Ledger accepted the defendant's invitation to accompany them. She drove Albert Ledger and his wife in their car, and the defendant drove separately in his own to Kittery. The glove compartment of the defendant's car contained a .22 caliber handgun. The defendant and the victim returned in the defendant's car from Kittery to the defendant's residence, a trailer, in Skowhegan.

While no direct evidence of the assailant's identity was presented at trial, the victim was sitting in the passenger seat of the defendant's car when she was shot twice in the left side of her head from within a distance of two feet. The resulting wounds were fatal. The bullets, both .22 caliber long rifle hollow points (which the evidence established could be fired from a .22 caliber handgun), travelled in virtually a lateral path from one side of her head towards the other. Bullets of the same type, though perhaps made by a different manufacturer, were found in the defendant's Skowhegan residence. The defendant's .22 caliber handgun was never found.[2]

With his wife's body still in the car, the defendant drove aimlessly during the night of May 11. The next day, he covered the body with a tarp and some tree boughs, and he parked the car in a hospital parking lot. Sometime later, the defendant retrieved his second car and drove to his mother's camp in Canaan. He remained there alone until

---

1. 17–A M.R.S.A. § 201(1)(A) provides: "A person is guilty of murder if . . . [h]e intentionally or knowingly causes the death of another human being. . . ."

2. The defendant testified that he and his wife drove to his Skowhegan residence. She remained in the car while he went into his trailer to pick up some laundry, when he heard two shots. He then ran toward the car and saw two people walk quickly from his car to another car and drive away.

May 16. That evening, he called his mother and asked her to bring him some food and to pick him up. When she arrived with the defendant's daughter, the defendant told them that his wife had been shot. The three drove to the Somerset County Sheriff's Office where the defendant reported his wife's death to several officers. Her death was evidently unknown to the authorities until that time. As a result of the defendant's report, an officer was dispatched immediately to the hospital parking lot. A deputy sheriff asked the defendant to accompany him to the Skowhegan Police Station, and the defendant responded, "I will go willingly, no cuffs, I'm tired of running." When interviewed, the defendant presented a version essentially identical to that narrated at trial. *See* note 2 *supra.*

The defendant was indicted for the murder of Carrie Ledger on July 10, 1980, and he was convicted after a jury trial.

### 1. *Juror Prejudice*

Pursuant to M.R.Crim.P. 21(a), the defendant moved on August 18, 1980, for a change of venue from Somerset County on the ground of prejudicial pretrial publicity. Presented at the October 24 hearing on this motion were a series of newspaper articles and what appears to be script copy for use by the electronic media.[3] Except for one article, which reported the scheduled hearing on the motion to change venue itself, all of the media accounts presented at the hearing reported certain developments in the case through the defendant's arraignment on July 28 when he entered a plea of not guilty. The earlier reports include the discovery of the victim's body after the defendant told officers that she had been shot and could be found in the parking lot, the existence of an undisclosed suspect in the homicide, and the defendant's arrest in connection with the shooting. The sole photograph accompanying those articles depicts the defendant, who is not handcuffed or restrained, walking to the Somerset County

Courthouse escorted by his counsel and a uniformed deputy sheriff.

Because the defendant moved well before trial to change venue and because the motion was not renewed at trial itself, we construe the August 18 motion as urging the court to change venue irrespective of whether the veniremembers were found to be actually prejudiced against the defendant. "A due process violation can occur when the publicity surrounding the case is of such an extensive and invidious nature as to constitute prejudice per se, in which case actual prejudice need not be shown." *State v. Grant*, Me., 418 A.2d 154, 158 (1980). *See State v. Clark*, Me., 386 A.2d 317, 320 (1978); *State v. Littlefield*, Me., 374 A.2d 590, 593–94 (1977); *State v. Ifill*, Me., 349 A.2d 176, 179–80 (1975).

◼ The media coverage, as presented to the court below, cannot be characterized as sufficiently extensive or invidious to render any jury drawn in Somerset County presumptively prejudiced. The media reports here are factual accounts of the developments in this case. The press and electronic media could be expected to be drawn to a story of this significance. Their reports appear to be factual and not sensational in tone. They did not urge official action or take any position on the question of the defendant's guilt or innocence. *See Clark*, 386 A.2d at 320; *Littlefield*, 374 A.2d at 593. Further, the media accounts presented at the October 24 hearing on the motion to change venue related to pretrial events, thereby allowing any impact they might in fact have had to dissipate before trial commenced several months later. *See Clark*, 386 A.2d at 320; *Littlefield*, 374 A.2d at 594. In *Littlefield* and *Clark*, we upheld the denial of a change of venue, sought by the defendant on constitutional grounds, in the face of pretrial publicity which was facially more prejudicial than that found here. We can find no error in the lower

---

**3.** Because a transcript of the October 24 hearing was not included in the record on this appeal, we remain unaware of whether the defendant demonstrated to the lower court that the copy had in fact been broadcasted and, if so, by what stations and when it had been broadcasted.

court's ruling that such publicity did not here create prejudice *per se* in this case.

The defendant here argues, on appeal, apparently for the first time, that the motion justice abused his discretion, apart from the constitutional claim, in failing to grant his August 18 motion for change of venue. We have found no such abuse in past cases involving media accounts which permit a stronger demonstration of the likelihood of potential prejudice than can be made in the case at bar. *See Clark*, 386 A.2d at 321; *Littlefield*, 374 A.2d at 595–96; *State v. Coty*, Me., 229 A.2d 205, 211 (1967); *State v. Hale*, 157 Me. 361, 366, 172 A.2d 631, 634 (1961). No such abuse of discretion can be found here.

The defendant's brief on this appeal may further be construed to raise, also for the first time in this case, the issue of actual prejudice among the jury panel. Even were it cognizable, this claim is without merit. Inquiry was made into whether any veniremembers were familiar with the case. Two persons who later sat on the jury panel stated on voir dire that they had only vague recollections of the incident, but each also stated that he or she had not formed any opinion as to the defendant's guilt or innocence. A third had been told by his wife that this case was scheduled for the period during which he would serve as a juror. On voir dire, he stated that he immediately told his wife "that I had better not hear any more...."

The objective of inquiries into the veniremembers' familiarity with a case "is to ascertain whether the potential jurors have acquired a bias or prejudice against the defendant or a fixed and settled impression as to his guilt or innocence." *State v. Heald*, Me., 333 A.2d 696, 698 (1975). Counsel for the defense posed questions during voir dire specifically designed to elicit this information, and the responses provided by those later selected as jurors clearly show that they had no pre-existing bias, prejudice, or settled impression as to the defendant's guilt or innocence. That several of the veniremembers, including some who were later selected as jurors, had some

knowledge of the case is not inconsistent with the constitutional requirements of due process. *See Lewisohn v. State*, Me., 433 A.2d 351, 355 (1981); *Littlefield*, 374 A.2d at 595; *cf. State v. Kelley*, Me., 357 A.2d 890, 898 (1976). As the defendant has not demonstrated the existence of actual prejudice against the defendant among the jurors, *cf. Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975), we find no obvious error or defect.

### 2. *Discovery Violation*

On December 9, 1980, several days before trial was originally scheduled to commence, the defendant filed a motion to dismiss the indictment on the ground that the State had violated the automatic discovery provisions of M.R.Crim.P. 16(a)(1)(C). At the hearing on this motion, counsel for the State admitted to the substance of the factual allegations asserted in the motion, that on December 8, the day preceding the filing of the motion, he had forwarded to defendant's counsel an anonymous handwritten note which read:

Dear Officer, There was a lady name [*sic*] Carrie, who died on Mother's Day. She should not of [*sic*] gone with my husband;

For she lay with a bullet hold [*sic*] in the head in a little green opel that kind of car brings bad memeroies [*sic*]. Too bad?

A state police report introduced at the hearing indicated that state authorities had possession of this letter on May 27, 1980, more than six months before it was submitted to the defendant. This police report, which referred several times to "an anonymous letter in regard to the LEDGER case," had been furnished to the defendant at an earlier date. While in the State's possession, the letter was examined for latent fingerprints, but none were found.

The court denied the defendant's motion to dismiss the indictment, reasoning that the police reports should have put defense counsel on notice as to the existence of the letter and because, although not dispositive, the State's attorney himself had not received the letter until several days before

he tendered it to defense counsel. The court did, on the other hand, grant the defendant's alternative motion to continue the trial date and to authorize funds necessary for an investigation of the note. Upon further motions made by the defendant over the next several months, the court later ordered several persons to submit handwriting exemplars as part of the defendant's investigation precipitated by his discovery of the existence of the anonymous letter.

M.R.Crim.P. 16(a)(1)(C) provides that

[t]he attorney for the State shall furnish to the defendant within a reasonable time . . . [a] statement describing any matter or information known to the attorney for the State which may not be known to the defendant and which tends to create a reasonable doubt of the defendant's guilt as to the offense charged.

The State contends here that the anonymous letter does not fall within the scope of rule 16(a)(1)(C) because it did not "tend to create a reasonable doubt of the defendant's guilt as to" the murder charge. The condition that, to be discoverable under rule 16(a)(1)(C), the material "tend to create a reasonable doubt" is one that is inevitably imprecise. *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342, 352 (1976). Because, however, the untimely discovery at issue here occurred prior to trial, we cannot properly evaluate the State's conduct under the rule in light of the effect of the anonymous letter *at trial.*[4] Rather, it must be examined in light of the circumstances existing at the time the existence of the allegedly discoverable matter became known to persons subject to the discovery obligations of rule 16.[5] The "reasonable time" within which the State must furnish the accused with matters or information subject to automatic discovery may often expire before the commencement of

trial. This was true here, where the State came into possession of the letter by May 27, 1980, less than two weeks after the homicide, and trial did not commence until February 1981. *Cf. State v. Simmons*, Me., 435 A.2d 1090, 1093 (1981). We must thus determine whether within a "reasonable time" after the State acquired the letter, it became subject to a duty to furnish information about the note to the defendant. We hold that it did.

■ Viewing the effect of the letter at that point in the case's development, we conclude that it tended to create a reasonable doubt of the defendant's guilt as to the murder charge. The contents of the letter created the possibility that the victim was involved in some manner with another man, thus creating a motive in that man's spouse to kill the victim. The note thus suggests that one *other than the defendant* was responsible for the victim's death. This possibility is particularly significant because no direct identification evidence existed at that time. This information thus fell within the scope of rule 16(a)(1)(C).

The State asserts that even if the letter tended to create a reasonable doubt of the defendant's guilt and is thus subject to automatic discovery under M.R.Crim.P. 16(a)(1)(C), which we conclude it is, the police report furnished to the defendant included the requisite "statement" describing the matter. We disagree.

■ In addition to promoting the requirement of constitutional due process, *see State v. Eldridge*, Me., 412 A.2d 62, 67 (1980); *Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342; *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), rule 16 functions "to enhance a defendant's opportunity to prepare for trial, and to diminish the element of unfair surprise." *State*

---

4. Indeed, the United States Supreme Court has recognized that "because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Agurs*, 427 U.S. at 108, 96 S.Ct. at 2399, 49 L.Ed.2d at 352.

5. The determination of whether as a consequence of the discovery violation the accused was deprived of a fair trial, on the other hand, can only be made in light of the events occurring at trial itself. *See Agurs*, 427 U.S. at 108, 96 S.Ct. at 2399, 49 L.Ed.2d at 352.

*v. Mason*, Me., 408 A.2d 1269, 1273 (1979); *see also Simmons*, 435 A.2d at 1093. By equalizing, as between the State and the accused, access to materials which the defendant could not easily obtain elsewhere, *State v. Morton*, Me., 397 A.2d 171, 176 (1979), the outcome of a criminal prosecution hinges "on the merits of the case rather than on the demerits of lawyer performance on one side or the other." *State v. Thurlow*, Me., 414 A.2d 1241, 1244 (1980). Thus viewed, rule 16(a)(1)(C) required the State to disclose to the defendant the information contained in the letter more specifically than by several passing references to it, buried in a police report, describing it non-specifically as an "anonymous letter." The language of the rule requires a "statement describing ... [the] matter or information"; this did not require the State to produce the letter *itself*. The production of the letter, once its existence is properly made known to defense counsel under rule 16(a), is to be determined by the discovery requirements of rule 16(b). Yet, the police reports, and the inclusion within those reports of references to the letter, did not provide the slightest clue as to the contents or *significance* of that letter. The purported discovery of these reports cannot be said to have operated to facilitate the defendant's opportunity to prepare for trial, to reduce the likelihood of unfair surprise, and thus to equalize the parties' position as to the availability of this evidence otherwise within the exclusive possession of the State.[6] *See Morton*, 397 A.2d at 176. Were we to hold otherwise, compliance with the automatic discovery requirements of rule 16 would be reduced to a game of "cat and mouse," a result facially inconsistent with the scope of the obligations the rule imposes upon the prosecutor, and with the profound importance of the requirements of the rule in assuring a defendant a fair trial. The State thus cannot be seen to have provided the required discovery of a *"statement* describing any matter or information ..." mandated by M.R.Crim.P. 16(a)(1)(C).

■ We are thus presented once again with conduct of the State falling short of the requirements created by M.R.Crim.P. 16. *See, e.g., State v. Hutchins*, Me., 433 A.2d 419 (1981); *State v. Simmons*, Me., 435 A.2d 1090 (1981); *State v. Thurlow*, Me., 414 A.2d 1241 (1980); *State v. Mason*, Me., 408 A.2d 1269 (1979); *State v. Bishop*, Me., 392 A.2d 20 (1978); *State v. LeClair*, Me., 382 A.2d 30 (1978). The seriousness with which this Court views such violations should by now have been etched into the consciousness of the prosecutorial bar. *See, e.g., Simmons*, 435 A.2d at 1094; *Hutchins*, 433 A.2d at 421; *Thurlow*, 414 A.2d at 1244; *Bishop*, 392 A.2d at 26. The obvious significance of the interests underlying the mandates of rule 16 must become the subject of profound sensitivity by that bar. As a corollary to the recognition of the importance of rule 16, prosecutors must give heed to our words that "Rule 16(a) requires 'a diligent inquiry of police agencies by a prosecutor as to whether such [automatically discoverable] information does exist.'" *See Thurlow*, 414 A.2d at 1244, *quoting State v. Flemming*, Me., 409 A.2d 220, 223 n.2 (1979). *Accord, Simmons*, 435 A.2d at 1093; *Hutchins*, 433 A.2d at 421; *Bishop*, 392 A.2d at 26. Indeed, if the prosecutors in this case had complied with this clearly articulated affirmative duty to inquire of all investigators on the case whether there existed automatically discoverable matters or information, this issue could well have been avoided.

■ Further, the nature of the default, whether it be by inadvertance or design, is immaterial to the determination of a breach of rule 16. *Cf. Agurs*, 427 U.S. at 110, 96 S.Ct. at 2400, 49 L.Ed.2d at 353; *Thurlow*, 414 A.2d at 1244. It is of no comfort to the defendant, when he is improperly denied the opportunity to prepare adequately for trial or when he is unfairly surprised at trial, that a good faith mistake foreclosed

---

**6.** Rule 16(a)(1)(C) limits discoverable matters or information to that "which may not be known to the defendant...." The exclusivity of the State's possession of the letter makes it

evident that the matter was not so known by the defendant. *Cf. State v. LeClair*, Me., 382 A.2d 30, 33 (1978).

the discovery to which he was entitled under rule 16(a). The purposes of the disclosure requirements remain unsatisfied regardless of the absence of any moral culpability on the part of the prosecutor's office or its agents.

■■■ The detrimental effects of the State's violation were, however, adequately remedied in this case by the trial court's choice of sanctions. The sanctions applicable under M.R.Crim.P. 16(d), as imposed by the trial court due to non-compliance with the rule, must operate to promote the interests of justice and will be set aside as an abuse of discretion or error of law only where they fail to do so. *Hutchins*, 433 A.2d at 421; *Mason*, 408 A.2d at 1272. The trial court's order continuing the commencement date of trial and making funds available to permit the defendant to investigate the note cannot be characterized as either such an abuse or error, as the defendant has not demonstrated any prejudice which was not thereby eliminated. These sanctions both enabled the defendant to pursue leads generated by the note, thus affording the defendant an opportunity to properly prepare his case, and foreclosed the possibility of unfair surprise if the note or its evidentiary fruits had been presented at trial. The lower court, therefore, did not err in denying the defendant's motion to dismiss the indictment on the grounds of the State's violation of rule 16(a)(1)(C).

### 3. *Inadequate Investigation*

The defendant claims for the first time in this case that the State's investigation into the homicide was sufficiently inadequate that the court below erred in failing to dismiss the indictment against him.[7]

■■■ A criminal defendant must be afforded "proper opportunity to attack the

probative value of the evidence developed by the police bearing on the defendant's guilt or innocence." *State v. Inman*, Me., 350 A.2d 582, 591 (1976). *Accord, State v. Hilton*, Me., 431 A.2d 1296, 1299 (1981). *Cf. United States v. Williamson*, 424 F.2d 353 (5th Cir. 1970). Through the opportunity to examine witnesses at trial, the defendant is provided with the proper vehicle with which to expose weaknesses in the State's investigation. *See Hilton*, 431 A.2d at 1299; *Inman*, 350 A.2d at 591. The trier of fact is then capable of determining whether there exist any weaknesses or gaps affecting the evidence as a whole so as to leave a reasonable doubt of the defendant's guilt. A pretrial dismissal of the indictment necessarily cannot rest on any knowledgeable or reliable determination of the sufficiency of the investigation to either preclude or leave open the existence of a reasonable doubt at trial. Any deficiencies in the official investigation which failed to eliminate a reasonable doubt of guilt are best exposed as such in the adversarial, truth-determining mechanism of trial. Thus, the court did not commit manifest error in failing to dismiss the indictment on this ground. Further, as the defendant has not shown that the court improperly circumscribed his opportunity to expose at trial any defect in the State's investigation, we find no error.

### 4. *Expert Testimony*

■■■ As part of its case in chief, the State called Richard Arnold, a firearms examiner at the state crime laboratory, who examined the bullet fragments retrieved from the body of Carrie Ledger. Outlining his qualifications, Arnold stated at trial that since June 1975, he had "examined most all bullet and cartridge casings microscopically that have been submitted to the

7. The defendant claims to find five such shortcomings: (1) the State did not attempt to inventory the car in which the victim's body was found; (2) it did not attempt to discover the identity of a person whom a hospital employee saw looking into the car at some point during the several days when the victim's body lay concealed in it; (3) it did not pursue certain information which the defendant provided during the course of the investigation; (4) a Somerset County deputy sheriff did not make a record, until June 1980, of conversations he had with the defendant in April 1980 in which the defendant expressed concern for the safety of his property left in his wife's custody; and (5) the State was unaware that the defendant's son owned a .22 caliber pistol.

State Police Crime Laboratory for examination or analysis." His training included attendance at tactical training schools, at "homicide and crime scene and search schools," at the FBI National Academy, and at eight firearms factories for instruction on how firearms and ammunition are manufactured. Arnold then testified that the lead pieces removed from the victim's body were consistent with those of two .22 long rifle hollow point projectiles.[8] When the State's attorney asked Arnold to describe the impact characteristics of a .22 long rifle hollow point bullet, defense counsel objected on the ground that the question called for a response that would exceed the scope of the witness' expertise. *See* M.R.Evid. 702. The court overruled the objection and allowed Arnold to answer the question.

The defendant asserts that this ruling constitutes an abuse of discretion. We need not address this point, because even if error were committed, it was harmless. *See* M.R. Crim.P. 52(a). The State's question on the fragmentation qualities of such a bullet was evidently designed to elicit Arnold's testimony identifying them as .22 long rifle hollow point bullets. Arnold had already testified, without objection, however, that those fragments could have been those of two .22 long rifle hollow point projectiles. The challenged evidence is therefore merely cumulative and cannot be other than harmless. *See Ginn v. Penobscot Co.,* Me., 334 A.2d 874, 886 n.1, *modified,* 342 A.2d 270 (1975).

### 5. Voluntary Statements

While incarcerated in jail awaiting trial, the defendant approached Somerset County Deputy Sheriff Robertson and described to him the events giving rise to this prosecution. Those statements were largely consistent with the version to which he has continually adhered, including that which he narrated at trial. At trial, the State called Robertson as a witness. Following a voir dire examination out of the jury's presence, the defendant moved to suppress Robertson's testimony about the defendant's statements on the sole ground that they were not made voluntarily;[9] the defendant was under medication, and Robertson described him as then being "confused" and "agitated." The court denied this motion and permitted Robertson to testify about the incident.

By buttressing their positions with cases involving the voluntariness of confessions, the parties do not appear to dispute the characterization of the defendant's statement to Robertson as a confession. For the purposes of this discussion, we thus also assume, rather than decide, that the defendant's statements may be treated as a confession.[10]

A confession is inadmissible unless the State proves beyond a reasonable doubt that it was made voluntarily. *State v. Ashe,* Me., 425 A.2d 191, 194 (1981); *State v. Collins,* Me., 297 A.2d 620, 627 (1972). The reviewing court must search the record for rational support of the lower court's determination. *State v. Catlin,* Me., 392 A.2d 27, 30 (1978); *Collins,* 297 A.2d at 625. That determination will be upheld unless the evidence renders a contrary inference to be the only reasonable conclusion which can be drawn. *Catlin,* 392 A.2d at 30. We find that the presiding justice did not err in finding that the statements were made voluntarily.

The attending physician who worked at Somerset County jail when the defendant was incarcerated there testified out of the jury's presence that, on the date the defendant made the statement to Robertson, he was taking medication for an ulcer and a heart condition.[11] The court asked whether

---

8. Bullets of the same type were found in the defendant's trailer.

9. The defendant has expressly disavowed any reliance on *Miranda* requirements.

10. We note that this characterization is a tenable one, at least to the extent that the defendant admitted to Robertson that his .22 caliber handgun was in the car on the date of his wife's death and that he was present at the scene of the crime.

11. The defendant asserts here that he was taking valium at the time he made the challenged statements to Robertson. The physician, how-

any of these drugs, either individually or in combination, would affect the patient's ability to tell the truth or his "will to speak." The physician responded in the negative. The record thus provides rational support for the court's conclusion that the medication did not induce involuntary statements.

 Robertson noted in his official report that the defendant, while making those statements to him, seemed "confused." At trial, he explained this to mean that the defendant "looked like he wanted to say something else to me [after Robertson insisted that he, Robertson, had to return to his office], but he never got it out." The defendant was described as "aggravated" when talking about his son and "upset" when describing the shooting incident itself. However, Robertson also testified that he knew the defendant, that the defendant was "alert" when making the statements, that the defendant was responsive, that he had no reason to believe that the defendant was "not in touch with his surroundings," and that the defendant narrated the events "in an organized fashion." This record thus also provides rational support for the court's ruling that the statements were made voluntarily. While Robertson's prior description of the defendant's condition as "confused" is facially troublesome, the witness' explanation revealed that it could not be taken so as to generate a conclusion, to the exclusion of all others, that the defendant acted involuntarily.[12]

6. *Testimony of Arguments and Complaints*

 Arlene Ledger Albert, the daughter of the defendant and the victim, testified during the State's case in chief that she lived in her parents' Smithfield home in February 1980, when her father moved out, until May of that same year. The defendant returned to Smithfield daily, she stated, and he and the victim would argue on those occasions. When Ms. Albert was asked how often those arguments occurred, the defense counsel registered an objection "to the nature of the inquiry" rather than to the "specific question itself," on the ground of remoteness and prejudice outweighing any probative value. The court overruled the objection.

Even assuming, without deciding, that the defendant's objection was sufficient to save his claim for appeal, we find that the court did not abuse its discretion in admitting this testimony. Rulings on the effect of remoteness on the admissibility of evidence are reviewed for an abuse of discretion. *State v. Lewisohn*, Me., 379 A.2d 1192, 1201 (1977). Remoteness of evidence of threats or quarrels affects the weight rather than the competence of the evidence. *State v. McEachern*, Me., 431 A.2d 39, 43 (1981) (testimony of threat made eighteen months prior to homicide admissible); *Lewisohn*, 379 A.2d at 1201 (testimony of threats made within two months of homicide admissible); *State v. Doyon*, Me., 221 A.2d 827, 829 (1966) (testimony of threat made two months prior to assault admissible). The court below did not abuse its discretion in refusing to exclude evidence of the quarrels that occurred within three months of the homicide.

Defense counsel did not articulate the basis for the claim that this evidence was more prejudicial than probative. *See* M.R. Evid. 403. This basis, however, appears to be identical to that underlying the remoteness claim, that because the quarrels were not proximate in time to the homicide, the

---

ever, testified that he did not prescribe valium for the defendant until more than three weeks after the defendant made the statements.

12. In its ruling, the trial court did not expressly refer to the standard of proof applicable in determining the admissibility of statements challenged as involuntary. There is, however, no indication that he used a lesser criterion. *See Ashe*, 425 A.2d at 194 n.4. Because the

evidence was sufficient to satisfy the more rigorous standard, *see id.*, and because defense counsel referred to the "reasonable doubt" criterion in her argument immediately preceding the court's ruling, we need not remand this case to allow the presiding judge to make express the standard that counsel and the court obviously had firmly in mind. *See id.*; *State v. Smith*, Me., 415 A.2d 553, 558 (1980).

testimony would confuse and mislead the jury. *See McEachern*, 431 A.2d at 43. This claim, however, is without merit, as we hold here that the quarrels were not sufficiently remote to foreclose the admission of testimony about them. Further, the probative value of this testimony is clear: "[i]n criminal prosecutions antecedent menaces, quarrels and hostilities are admissible in proof of the malice or intention with which an act is done." *Doyon*, 221 A.2d at 829. *Accord, Lewisohn*, 379 A.2d at 1201. No abuse of discretion can be found as to this claim.

Later, defense counsel objected on the ground of remoteness, prejudice, and hearsay to a question calling for Ms. Albert's recollection of a statement made in April 1980 by the defendant during a particular discussion with the victim. As an offer of proof, the State's attorney explained at a sidebar conference that he expected the witness to testify that the defendant asked his wife to abandon the divorce action; when she refused, the defendant became very upset and left.

For reasons we have discussed, *supra*, such testimony is not inadmissible on the ground that it relates to matters too remote in time. Further, any prejudicial effect is outweighed by its probative value. *See* M.R.Evid. 403. These two challenges to this testimony are thus not meritorious.

As to the hearsay claim, *see* M.R. Evid. 801(c), the State identified one of its purposes in introducing this testimony as to demonstrate the nature of the defendant's relationship with the victim. Testimony of the mid-April incident would be probative on this point without a belief in the truth of the particular statements made by the participants. Ms. Albert's testimony, in this light, was not offered for its truth and is therefore not objectionable as hearsay. *See Maine Gas & Appliances, Inc. v. Seigel*, Me., 438 A.2d 888, 891 (1981).

The State also introduced testimony that the defendant told the victim that he wanted her to drop the divorce suit, in order to prove that very point. The truth of the out-of-court declaration is thereby

implicated. The statement is not, however, a hearsay statement. *See* M.R.Evid. 801(d)(2)(A). The statement offered in evidence was the defendant's own, made in his individual capacity. "It need not have been against [the defendant's] interest when made." Field and Murray, *Maine Evidence* § 801.5 at 193 (1976). It could properly be admitted as substantive evidence of the facts stated. *State v. Sockbeson*, Me., 430 A.2d 1105 (1981).

Finally, Somerset County Deputy Sheriff Hardwick testified about complaints and threats that the defendant made to him against the victim in April and May 1980. As with threats against and quarrels with the victim herself, these threats and complaints are probative of the defendant's scienter. *See Lewisohn*, 379 A.2d at 1201; *Doyon*, 221 A.2d at 829. The trial court committed no abuse of discretion by overruling the defendant's objection to this testimony on the ground that it created a danger that the jury would rely too heavily on it. The significance of these complaints and threats in proving motive and intent, and the defendant's opportunity to cross-examine the witness to expose any mitigating circumstances in which they were made, renders the court's ruling a proper one.

### 7. *Polygraph*

The defendant's claim that the lower court erred in excluding the results of a polygraph examination given the defendant needs no lengthy analysis. He claims that the admitted incredibility of his account, the fact that the account is uncontradicted by direct evidence, and the weak presentation of it to the jury, caused by his own admitted inarticulateness and low level of intellectual skills, combine to require the admission of the polygraph examination and the polygraph examiner's conclusion that the defendant truthfully rendered his exculpatory version.

These observations, however, must be subordinated to our fundamental concerns with the reliability of the polygraph as an indicator of truthfulness, *see State v. Trafton*, Me., 425 A.2d 1320, 1322 (1981); *State*

*v. Bowden*, Me., 342 A.2d 281, 285 (1975); *State v. Mower*, Me., 314 A.2d 840, 841 (1974), and with the dangerous possibility that credibility will thence be evaluated by the device rather than by the trier of fact, *see State v. Hilton*, Me., 431 A.2d 1296, 1303–04 (1981) (Carter, J., concurring); *Trafton*, 425 A.2d at 1322 n.2; *State v. Edwards*, Me., 412 A.2d 983, 986 (1980); *cf. State v. Williams*, Me., 388 A.2d 500, 502–03 (1978). *See generally Hilton*, 431 A.2d at 1300–01; *State v. Burnham*, Me., 427 A.2d 969, 971 (1981). The circumstances and situation of the defendant do not operate to negative these weighty considerations. No error can be attributed to the court's exclusion of this evidence.

### 8. *Evidence of Others' Threats and Motives*

 Because of the circumstantial nature of the evidence linking the defendant to the homicide, the defendant sought at trial to create a reasonable doubt of his guilt by suggesting that other persons were responsible for the act. As defense counsel explained out of the jury's presence, two theories were thought to implicate as the assailant Joseph Albert, the husband of Arlene Ledger Albert and the son-in-law of the defendant. Both theories rest on the same factual basis. Mr. Albert was an inmate at the Pre-Release Center in Bangor where, defense counsel stated, members of its population are granted restricted liberties. Albert took some food, which he said was stolen from the Center, to the Ledger's house in Smithfield. Joan Ledger, another of the defendant's daughters, learned of this and reported it to the Center's officials. Joan also told her father who himself notified either the officials, or a person who later reported the matter to them. Defense counsel further represented that Mr. Albert made "less than valid threats" and "indirect threats" against both the defendant and his daughter, Joan. The defendant testified, without objection, that he thought the bullets which killed his wife were "meant for me." Defense counsel also theorized that Mr. Albert intended to kill Joan because of her participation in reporting the stolen

food. Counsel therefore sought to introduce a photograph demonstrating the physical similarities between Joan and her mother, the victim.

Before the defendant testified, and at several points during Joan Ledger's testimony, both counsel engaged in colloquies with the court concerning the admissibility of Mr. Albert's testimony and of the photograph depicting Joan Ledger and her mother, as such evidence would bear on the issue of identification. The defendant asserts on this appeal that the presiding justice erred in excluding the testimony of Mr. Albert. We do not so construe the court's ruling.

The lower court appeared to recognize the general rule that a defendant may introduce evidence tending to show that another person committed or harbored an intent, motive, and opportunity to commit the crime of which that defendant is charged, if such evidence is not too remote in time or too weak in probative value under M.R. Evid. 403. *See, e.g., State v. LeClair*, Me., 425 A.2d 182, 187 (1981); *State v. Kotsimpulos*, Me., 411 A.2d 79, 81 (1980); *State v. Berube*, 139 Me. 11, 15, 26 A.2d 654, 656 (1942); *Marrone v. State*, 359 P.2d 969, 984–85 (Alaska 1961); *State v. Schmid*, 109 Ariz. 349, 355–356, 509 P.2d 619, 625–26 (1973); *cf. State v. Hilton*, Me., 431 A.2d 1296, 1299 (1981). Before the defendant took the witness stand, both counsel and the court discussed the possibility that the defendant would implicate Mr. Albert in the homicide. The following exchange ensued after defense counsel expressed an intention to present Mr. Albert as a witness and to introduce into evidence proof of his manslaughter conviction:

[State's counsel]: Well, regardless of the conviction, my position is, there is no way under the Rules of Evidence that is admissible to prove that he [Albert] might have committed this act.

[Defense counsel]: I agree absolutely with that.

COURT: Well, I don't want you to put him [Albert] on the stand and seek to discredit his testimony unless there is a reason that Harold [Ledger] had for fearing for his life. . . .

... I want to be satisfied there is a basis for [implicating Albert] as opposed to just charging someone because he is conveniently in the family and has been convicted in a criminal matter before, and he is conveniently there.

After further discussion, the court told defense counsel:

I don't think there is any way I am going to permit you to put on Albert unless you can establish the kind of testimony ... [that can be] discredit[ed by] the introduction of his record. It doesn't make sense. You're trying to suggest something that isn't there.

When making these remarks, the presiding justice appeared to have understood the defendant's strategy to be the presentation of Mr. Albert as a witness in order to introduce his criminal record. The court's remarks demonstrate that it would permit Mr. Albert to testify that he had threatened the defendant or Joan Ledger; conversely, the court would not permit him to take the stand if the defendant's only purpose was to effect the admission of Mr. Albert's manslaughter conviction. *See* M.R.Evid. 404(a)(2), 607–609. The nature of this ruling was made even more clear during a subsequent conference in chambers.

[Defense counsel]: ... The Court at one point requested whether I was going to put [Albert] on the stand or not.

COURT: I acknowledge that you can call him and put him on the stand. I said I didn't know what you would do. I understood you would put him on the stand just to try to discredit his testimony by showing his record.

It is thus apparent that the court below did not prevent the defendant from calling Mr. Albert to testify as to whether he had made any threats against either the defendant or Joan Ledger. His failure to testify is not attributable to the court, and so no error can be found in the defense counsel's election not to call him as a witness.[13]

Also revealing is the parties' discussion with the court about whether Joan Ledger would be permitted to testify that she was aware of threats made against her by Joseph Albert:

COURT: Then, as I say, you want to put [Joan Ledger] on, I guess, and she will say she heard some threats. You're entitled to put them on, but I'm a little bit reluctant to listen to it, so once you have introduced this evidence by way of hearsay, because I guess the State is also entitled to cross examine the witness, equally, especially because of the consequence of this kind of evidence of this nature that could be put on. As I said, whether they are valid threats or invalid threats to this witness, you can introduce it.

[Defense counsel]: Your Honor, can I not introduce the fact that she did make complaints [to the Center] on behalf of her father. From my question yesterday, as I understand it, I can't get into anything that she heard about these threats. That would be hearsay, as I understand it.

COURT: What makes the information material and relevant, sure, but I can rule it as hearsay if you get the threats in. I don't know at this point.

[State's attorney]: Maybe I won't object if she proves it.[14]

Defense counsel asked no further questions on direct examination when this conference terminated. Thus, while defense counsel indicated to the court an intent to elicit from Joan Ledger testimony of the threats, and while the court left open the door to such questioning, the opportunity to do so was never actually exploited. The defendant cannot now argue that the court refused admission of testimony about such threats.

509 P.2d 619, 626 (1973), *with* 1 *Wigmore on Evidence* §§ 139–140 (1940 and Supp. 1981).

**13.** We therefore do not reach the issue of whether proof of threats by and motive in a third person is admissible by itself, as tending to create a reasonable doubt as to the defendant's responsibility for the criminal act. *Compare, e.g., State v. Schmid,* 109 Ariz. 349, 356,

**14.** *But see State v. True,* Me., 438 A.2d 460, 468 (1981).

■ The defendant also offered a photograph of Joan Ledger and her mother for the purpose of showing that the two looked alike. Without proving as a foundation that a third party may have intended to harm Joan, a demonstration that Joan physically resembled her mother would have been immaterial to any issue then in the case. *See* Field and Murray, *Maine Evidence* § 401.1 (1976). The trial court explicitly conditioned the admissibility of that photograph on the production of proof that threats were in fact made against Joan. This ruling was correct and without error. *See* M.R.Evid. 401.

■ Finally, the defendant sought to introduce several photographs which portrayed Joseph Albert and the defendant's son. A hospital employee had testified that, for several seconds, he saw someone look into the defendant's car when it was parked in the hospital parking lot during the week of May 11, 1980. The witness' description of that person was vague, and he was unable to determine whether or not any of those persons in the photographs resembled the person he saw some months earlier.[15] Rulings on the admissibility of demonstrative evidence are reviewed for an abuse of discretion. *Cope v. Sevigny*, Me., 289 A.2d 682, 689 (1972). Because the hospital employee was unable to say whether the photograph portrayed the same person he saw peering into the car in May 1980, the court did not abuse its discretion in excluding the photograph. *See* McCormick, *Handbook of the Law of Evidence* § 214 (1972).

### 9. Competence of the Defendant

■ Toward the end of trial, the defense counsel presented to the court in chambers a forensic psychologist who said that he was "seriously concerned about Mr. Ledger's intellectual limitations and possible organic brain syndrome and this man's ability to assist his attorney." He ex-

plained his hypothesis that the defendant's brain was not receiving enough oxygen, thereby rendering him unable to answer abstract questions and to provide "concrete answers that you would expect from a child." After further discussion among the court, the psychologist, and counsel, the court expressed satisfaction that the defendant was competent to stand trial and that further inquiry would be unnecessary. The court made clear that its decision was based on its observations of the defendant as a witness while he had testified the previous day for nearly three hours, the defendant's courtroom behavior over the previous seven days, and the limited nature of the psychologist's evaluation. The defendant claims here that this ruling was error.

The constitutional requirements of due process are satisfied where "the accused is capable of understanding the nature and object of the charges and proceedings against him, of comprehending his own condition in reference thereto, and of conducting in cooperation with his counsel his defense in a rational and reasonable manner." *Thursby v. State*, Me., 223 A.2d 61, 66 (1966), *quoted in Littlefield v. State*, Me., 429 A.2d 1006, 1009 n.3 (1981). *See* Me. Const.Art. I, § 6; U.S.Const.Amend. VI; *see also Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824, 825 (1960) (the accused must have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"). When the court becomes aware of a *genuine* doubt of the defendant's competence to stand trial, it must make inquiry into the matter. *Thursby*, 223 A.2d at 68. The existence of a need to embark upon such an inquiry is a determination made within the sound discretion of the court. *Id.*, at 68–69. Further, the reviewing court must determine if the record includes evidence which would support the lower court's ruling. *Littlefield*, 429 A.2d at 1009.

---

15. When asked if the person he saw resembled anyone in the photograph, the witness replied: "I want to make an intuitive yes, but I am reluctant to do that.... [My intuition] says,

'Yeah, that guy looks like him there,' but there is no way that I could reconstruct the information to come out with that person for you."

We find that such evidence exists. Of primary significance is the court's opportunity to observe firsthand the behavior of the defendant during the course of his testimony and throughout the trial itself. While the transcript demonstrates that the defendant rambled in answering several of the questions posed to him, the court correctly pointed out that he responded to counsel's insistence that he answer the question. This demonstrates, not only that the defendant comprehended his own situation and was able to cooperate and communicate with counsel, but also that he understood the question itself. *See United States v. Oliver*, 626 F.2d 254, 258–59 (2nd Cir. 1980); *cf. State v. Furrow*, Me., 424 A.2d 694, 698 (1981).

██ Further, there is no indication that the defendant was not competent under the *Thursby* criterion. The psychologist expressed concern that the defendant, who claimed to be a woodsman, was unable to distinguish between a salmon and a trout,[16] and that he referred to his wife in the present tense. The defense counsel also noted that the defendant could not remember whether Mother's Day, the day of the homicide, fell on a Saturday or a Sunday. The fundamental concern in a competency inquiry, however, is "with the mental capacity of the accused *as it relates to the criminal adjudication process.*" *State v. Vane*, Me., 322 A.2d 58, 62 (1974) (emphasis added). We have said that a defendant may be mentally competent to stand trial although in some other respects his mind is unsound. There are many prisoners who, although competent to stand trial, nevertheless suffer from some level of mental disturbance or defect or require in some respect psychiatric treatment. *Thursby*, 223 A.2d at 68. These specific factual observations of the psychologist and defense counsel therefore could properly be viewed by the trial judge as being of only minimal importance. Defense counsel informed the court that she had to request a recess during the testimony of a police officer in order to explain that testimony to the defendant. In view of the fact that the defendant was then made to understand that testimony, in the context of the other factors indicating the defendant's competence, we do not find this apparently isolated difficulty in communication as sufficient to require a full hearing into the matter. Indeed, it demonstrates that the defendant was susceptible to consultations "with his lawyer with a reasonable degree of rational understanding." *See Dusky*, 362 U.S. at 402, 80 S.Ct. at 788, 4 L.Ed.2d at 825.

We conclude that, on this record, the court acted within the proper scope of its discretion by concluding that no genuine issue existed as to the defendant's competence to stand trial, thereby eliminating the need for a full hearing on the issue.[17]

### 10. *Motion for Funds*

██ The defendant claimed at a motion for new trial that the jury may have been improperly influenced by two events. First, at the trial, an inmate of the Somerset County jail testified out of the jury's presence that the defendant admitted shooting his wife. The State withdrew this proffered evidence. The defendant argued at the hearing that one or more of the jurors may have been exposed to any newspaper stories describing the inmate's testimony.[18]

Additionally, the defendant stated that on the day before the jury deliberations, a

---

**16.** The court expressed some skepticism at the psychologist's own understanding of the nature of that difference.

**17.** *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), and *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), cited by the defendant, are factually distinguishable from the case at bar, as they rest on facts that are clearly more eggregious

than those presented here in demonstrating a lack of competence.

**18.** It was revealed during trial that the husband of one of the jurors was present in the courtroom during this testimony. The court interviewed the juror and was assured that the visitor said nothing to her about the testimony. The defense counsel was expressly satisfied with this conclusion.

television program dealing with techniques of crime investigation was broadcasted locally. One segment of the show depicted the autopsy of a person who had been shot in the head. The similarity of the circumstances displayed in the program to the physical facts of this case was thought to create the possibility of juror prejudice. Consequently, the defendant requested funds to subsidize an investigation into the possibility. The court rejected the motion. Here, the defendant claims error in this ruling, framing, for the first time in the case, the issue as a denial of equal protection. Relying on *State v. Curtis*, Me., 399 A.2d 1330 (1979), which found constitutional error in the denial of funds for a transcript of a suppression hearing to be used for impeachment purposes at trial, the instant defendant claims that the denial of funds to permit an investigation into juror prejudice unconstitutionally imposed a hurdle to an effective defense or appeal which would not be present if the defendant could himself afford to undertake such an investigation.

We conclude, however, that the court below was not presented with a sufficient basis to conclude that such an investigation would be necessary. The trial judge is charged with making a "threshold inquiry into whether potential prejudice exists" as a result of publicity generated by the proceedings. *State v. Bazinet*, Me., 372 A.2d 1036, 1039 (1977). Further, "[o]nly where potential prejudice is determined to exist should the presumption of actual prejudice arise and the duty of the court to voir dire attach." *Id.* It is clear that the mere publication of extraneous information revealed during the course of trial cannot by itself create a presumption of actual prejudice and the resulting need to voir dire. *Id.* Further, the "news report" causing concern to the defendant has not been made part of the record on this appeal; it was not offered to the trial court during the motion for a new trial; indeed, defense counsel made no attempt to describe with any particularity its contents.

The defendant bears the burden of demonstrating that a new trial is warranted. *See Carver v. Lavigne*, 160 Me. 414, 421, 205

A.2d 159, 163 (1964); *London v. Smart*, 127 Me. 377, 379, 143 A. 466, 467 (1928); *see also* 58 Am.Jur.2d "New Trial" § 200 (1971). We cannot say that the defendant has presented a basis compelling the court below to find the existence of potential prejudice and thus a need to investigate that possibility. *Cf. United States v. Oliver*, 626 F.2d 254, 260 (2nd Cir. 1980) and *Mason v. Arizona*, 504 F.2d 1345, 1352 (9th Cir. 1974), *cert. denied*, 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975), examining 18 U.S.C. § 3006A(e).

■ One final point relating to the media report deserves note. The witness, whose testimony was assertedly the subject of the news story, appeared in court on February 13, 1981, five days before the jury began its deliberations. If defense counsel became aware of the news report within that five day period and had informed the court about it, the court could then have taken any measure it deemed necessary to inquire into the existence of actual prejudice and to cure such defects, for example, by substituting the tainted juror with an alternate, if such defects were found to exist. Yet the defendant did not account at the hearing for his failure to raise this matter at trial when remedial measures were available, without the need for the expense and burden of a new trial. He has thus failed to satisfy his burden, *see Carver*, 160 Me. at 421, 205 A.2d at 163; *London*, 127 Me. at 379, 143 A. at 467, of presenting a properly postured basis compelling the court to allow inquiry into the need for a new trial. *Cf. Brown v. People*, 138 Colo. 354, 356, 332 P.2d 996, 998 (1958) (motion for new trial properly denied where allegedly prejudicial incidents, involving communications between the State's witnesses and jurors, were not brought to the court's attention until the motion for new trial was filed).

The television program portraying the autopsy is postured somewhat differently in the motion for new trial than the news account, because defense counsel explicitly

represented to the court that it had not come to her attention any earlier than the commencement of the jury's deliberation. Further, defense counsel described the contents of the program in greater detail than that of the news report. The court was thereby made susceptible to a more knowledgeable appreciation of the nature of that program and of its effect on the members of the jury, if seen by them.

On the basis of the description presented below, however, we find that the court could properly conclude that the program did not create potential prejudice. Medical and other official testimony presented by the State in this case described in occasionally graphic detail both the condition of the victim's body when it was discovered and the autopsy performed on it, including an account of how the bullet fragments were retrieved from the skull and isolated from brain and other cranial matter. Because the court could properly find that the program would not, in this light, create potential prejudice among the jurors, there arose no duty to inquire into the existence of actual prejudice. *See Bazinet*, 372 A.2d at 1039. Accordingly, the court's ruling that an independent investigation by the defendant into that possibility was unwarranted was also a proper one and cannot form the basis for a claim of constitutional error. *Cf. Oliver*, 626 F.2d at 260; *Mason*, 504 F.2d at 1352.

### 11. *Sufficiency of the Evidence*

There is one single standard of proof for all criminal convictions, and the test is the same in a case of either circumstantial or direct evidence:

whether from all the evidence and from such reasonable inferences as may properly be drawn therefrom the guilt of a defendant has been proved beyond a reasonable doubt.

*State v. LeClair*, Me., 425 A.2d 182, 184 (1981), *quoting State v. Jackson*, Me., 331 A.2d 361, 365 (1975). We further held in

*LeClair* that when the incriminating evidence is circumstantial and there exists evidence consistent with the defendant's innocence, "[t]he jury's guilty verdict must be based not on a determination that there exists no alternative explanation, but that, after assessing the credibility of such [exculpatory] explanations, they raise no reasonable doubts as to the defendant's guilt." 425 A.2d at 184. *Accord, State v. Pinkham-Murch*, Me., 432 A.2d 1297, 1300 (1981).

In light of the evidence presented, which we have carefully reviewed, the jury was entitled to conclude that the defendant's exculpatory testimony, though uncontradicted, was not credible, *see Qualey v. Fulton*, Me., 422 A.2d 773, 775–76 (1980), and that the State's evidence was sufficient to preclude any reasonable doubt of his guilt. *See LeClair*, 425 A.2d at 185.

### 12. *Conclusion*

We have carefully reviewed both the facts and the law underlying the defendant's remaining claims of error, including the admission of testimony of Somerset County Deputy Sheriff Peter Hardwick and the exclusion of that part of Paul Victor's testimony concerning an abstract individual's reaction to the death of another. None of these claims merit discussion.

The entry is:

Judgment of conviction affirmed.

All concurring.